UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COGENT COMPUTER SYSTEMS, INC. | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 06-280 S |
| TURBOCHEF TECHNOLOGIES, INC. | : | |
| Defendant. | : | |

**DEFENDANT TURBOCHEF TECHNOLOGIES, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY AND COMPEL ARBITRATION**

Defendant Turbochef Technologies, Inc. ("Turbochef") submits this reply brief in support of its motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the lawsuit in its entirety or, alternatively, to stay the action and to compel enforcement of a contractual arbitration agreement pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*.

Plaintiff Cogent Computer Systems, Inc.'s ("Cogent") opposition is based on two fundamental, erroneous legal premises, namely that: 1) Rhode Island law applies to Turbochef's motion; and 2) Turbochef's motion should be decided solely on the basis of Cogent's factual allegations and without any consideration of Turbochef's proof. To the contrary, when the Court applies the only law applicable – Georgia law – and considers the proof submitted by both parties, the Court must either grant Turbochef's motion or, at worst, hold it in abeyance pending a trial, after appropriate discovery, on the issue of whether there was an agreement to arbitrate. 9 U.S.C. § 4.

## ARGUMENT

At the outset, the parties agree with four fundamental principles: 1) the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., applies in this case; 2) the federal policy under the Act favors arbitration; 3) the initial inquiry under the Act is whether there is a valid and enforceable arbitration provision; and 4) in deciding this latter question, state law of contract controls (although the Court must apply ordinary state law principles governing the formation of contracts with due regard to the federal policy favoring arbitration, *Bank One v. Coates*, 125 F. Supp.2d 819, 827 (S.D. Miss. 2001), *aff'd*, 34 Fed. Appx. 964 (5th Cir. 2002)). That is where the agreement ends, however, for Cogent believes Rhode Island law should apply and Turbochef's motion should be based solely on the facts submitted by Cogent. Both of these arguments are in error for the reasons discussed below.

### I. GEORGIA LAW – NOT RHODE ISLAND LAW – APPLIES IN THIS CASE

Cogent assumes that Rhode Island law applies without explanation or analysis. Cogent is wrong as a matter of law. Even assuming, *arguendo*, that Cogent's version of the facts was the only one in play and could create an enforceable contract (and disregarding, for the moment, any of Turbochef's verified proof), Georgia law would still apply. In essence, Cogent alleges that on January 18, 2006, Michael Kelly, Cogent's Vice President of Engineering, sent an email communication to Terry Gray, Turbochef's Director of Imbedded and Hardware Controls, setting forth an *offer* for Cogent to construct the micro computers for Turbochef, with an initial lot of 500 units at $149 per unit. Affidavit of Michael J. Kelly at ¶ 4 & Exh. 1. Cogent claims that Michael Kelly received a phone call from Terry Gray "orally accepting Cogent's offer and confirming that the Purchase Order and check would be sent immediately." *Id*. at ¶5. Cogent

further claims that Turbochef "sent a Purchase Order, signed by an authorized representative to Turbochef dated January 18, 2008, where Turbochef agreed to purchase 5000 units of the micro computer system." *Id*. at ¶ 6. Cogent submits that Exhibit 2 to Michael Kelly's Affidavit is the Purchase Order sent by Turbochef. *Id*. at ¶ 6, Exh. 2. The Purchase Order provides that the buyer (*i.e.*, "Bill To:") is "Turbochef Technologies, Inc., Six Concourse Parkway, Suite 1900, Atlanta, Georgia 30328-6183."[1]

Under this scenario, even assuming it is true and could create an enforceable contract (which is not true, as discussed in Part II below), Georgia law applies. A federal court sitting in diversity must apply the choice of law rules of the forum in which it sits. *Klaxon v. Stentor Electric Mfg. Co*., 313 U.S. 487, 496-97 (1941). Rhode Island's conflict-of-laws doctrine provides that the law of the state where the contract was executed governs. *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474, 484 (R.I. 2004). As the Rhode Island Supreme Court has noted, "Acceptance of the offer, *Tim Hennigan Co. v. Anthony A. Nunes, Inc.*, 437 A.2d 1355, 1357 (R.I. 1981), or 'the final act which constitute[s] the making of the contract,' *A.C. Beals Co. v. Rhode Island Hospital*, 110 R.I. 275, 285, 292 A.2d 865, 870 (1972), determines the state of completion." *DeCesare*, 852 A.2d at 484. In this case, under Cogent's alleged scenario, the so-called "offer" – the offer that Michael Kelly made by email on January 17, 2006 -- was accepted by Turbochef, a Georgia buyer, as confirmed by the Purchase Order. Accordingly, the final act of execution was by a Georgia buyer when Turbochef issued the Purchase Order signed by its authorized representative. *DeCesare*, 852 A.2d at 484 (ruling that Nebraska law applied to insurance policy because application was an offer which was not effective or binding on insurer until application was approved and signed at insurer's home office in Nebraska).

---

[1] Turbochef's corporate headquarters are located in Atlanta, Georgia. Declaration of April McLain at ¶ 6.

Similarly, under Turbochef's version of events (which is the only scenario that creates an enforceable contract, as discussed below), Georgia law applies too. As outlined in the Declaration of April McLain and Terry Gray, Turbochef's April McLain sent an initial Purchase Order to Cogent, but indicated that there was only one authorized signature and a second was needed from corporate headquarters in Atlanta, Georgia. Declaration of April McLain ("McLain Decl.") at ¶ 6. Moreover, the Purchase Order was not in force until Cogent received, at its own request, the initial seed money of $89,500 to begin the design and construction of the first 500 boards. *Id*. at ¶ 8; Declaration of Terry Gray ("Gray Decl.") at ¶ 12. Only a week later, after realizing the Purchase Order had inadvertently omitted language indicating the Purchase Order was subject to additional terms and conditions and would not constitute an offer to buy in the absence of such terms and conditions, April McLain faxed a corrected Purchase Order with the Additional Terms and Conditions. McLain Decl. at ¶¶ 9-12 & Exh. 2; Gray Decl. at ¶ 16. That facsimile was received by Cogent, as indicated in the fax confirmation sheet. McLain Decl. at ¶ 10 & Exh. 2. On the same day the Purchase Order and the Additional Terms and Conditions were received, the initial seed money of $89,500 was received by Cogent, making the corrected Purchase Order enforceable on that date. *Id*. at ¶ 15; Gray Decl. at ¶ 17. Thereafter, Cogent deposited the check, began work on the project and never objected to any aspect of the corrected Purchase Order. McLain Decl. at ¶¶ 16; Gray Decl. at ¶ 18. The Additional Terms and Conditions contain a Governing Law clause in Paragraph 21 establishing that Georgia law applies to the Purchase Order: "This Order and the construction of the provisions hereof shall be construed and interpreted in accordance with the laws of the State of Georgia, including Georgia Uniform Commercial Code as in effect on the date hereof, *provided, however,* that Buyer shall

be entitled to the benefits of any revisions in the Georgia Uniform Commercial Code thereafter which increase the rights of buyers of goods." McLain Decl. at ¶ 14.

Thus, regardless of which scenario the Court considers, Georgia law, not Rhode Island law, applies.

## II. UNDER GEORGIA LAW, COGENT IS BOUND TO ARBITRATE

Not only has Cogent improperly relied upon Rhode Island law, Cogent's arguments are premised, almost exclusively, on its own one-sided view of the facts to the exclusion of Turbochef's proof. However, courts have held that, in the context of determining whether there has been an agreement to arbitrate, a summary judgment standard should apply. *See, e.g.*, *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002); *Smarttext Corp. v. Interland, Inc.*, 296 F. Supp.2d 1257, 1262-63 (D. Kan. 2003) (collecting cases); *Brown v. Dorsey & Whitney, LLP*, 267 F. Supp.2d 61, 66-67 (D.D.C. 2003). Thus, if there are genuine issues of material fact, then there must be a trial, after appropriate discovery, on whether there has been an agreement to arbitration. In this Section II, Turbochef will show that, in considering the *undisputed* evidence before this Court filed by *both* parties, Cogent is bound to arbitrate under the Additional Terms and Conditions of the corrected Purchase Order. (Turbochef argues, alternatively, in Section III that, at worst, there are genuine issues of material fact requiring a trial.).

### A. Michael J. Kelly's Email Was Not An Offer That Turbochef Accepted

As noted above, Cogent's central premise is that Michael Kelly's January 18, 2006 email to Turbochef's Terry Gray was an offer that Turbochef orally accepted, creating an enforceable contract, that this email contract was later confirmed by Turbochef sending a Purchase Order,

and that the corrected Purchase Order with the Additional Terms and Conditions was an improper attempt to modify the existing contract. However, the email cannot constitute an "offer" that was accepted either orally or through the issuance of a "confirming" Purchase Order, as a matter of law, for several reasons.

First, the email could not be "orally accepted" because, by its very terms, the email did not contain a single offer that simply could be accepted by Turbochef, as alleged by Cogent. Rather, the email contained two very different proposals. Kelly Aff. at Exh. 1; Gray Decl. at ¶¶ 7-8. The first called for a two-part design consisting of two boards – the first board would be a small board with a microprocessor (ARM 9) and the second board (or custom target board) would have all the components needed to control the oven. Kelly Aff. at Exh. 1; Gray Decl. at ¶ 7. The first, smaller board would plug directly into the second custom target board. *Id*. The two-part design is reflected in items 1 through 3 in Mr. Kelly's email. He was proposing a price for the two-part board design of $149 each plus the unspecified actual cost for the custom target board and parts (referenced as "PCB" in the email). *Id*. This two-part design would be delivered in lots of 500. *Id*. The second proposal in Mr. Kelly's email was distinct from the first. Kelly Aff. at Exh. 1; Gray Decl. at ¶ 8. The second proposal called for a "flattened" design. *Id*. This meant that the two boards would be combined into a single board or "flattened" out. *Id*. Mr. Kelly indicated that the design could be "flattened" for an additional fee of $25,000 plus unspecified additional costs for the PCB, parts, etc. for up to 25 units. *Id*. After the design was created, the proposed price for each flattened board was $149, but the minimum order would be 1,000 units. *Id*.[2] Moreover, the email was incomplete, lacking specificity as to the upfront

---

[2] Mr. Kelly's email also contained additional options for Turbochef's consideration. Cogent was offering to charge a license fee of $125,000 after the first 5,000 units had been produced. Kelly Aff. at Exh. 1; Gray Decl. at ¶ 9. This was an "intellectual property" fee that would allow Turbochef to purchase the design if it wanted to have another

payment and containing no delivery dates for design and production of the boards. Thus, Cogent's assertion that this email "offer" was simply accepted orally is inconsistent with the facts. *See Bruce Tile Co. v. Copelan*, 185 Ga. App. 469, 470, 364 S.E.2d 603, 605 (Ga. App. 1988) (ruling that party's signature on proposal "cannot indicate acceptance of an offer sufficient to form a contractual agreement since nowhere on the face of the document is there any indication which of the two proposals he is accepting.").[3]

Indeed, Cogent's argument that the email constitutes the offer, later accepted orally and then confirmed by the Purchase Order, is inconsistent with the allegations in Cogent's own complaint. The complaint makes no mention of the email, but rather alleges that the Purchase Order is the contract the parties agreed upon in this case – not merely a confirmation of an already existing contractual agreement. Cogent Complaint at ¶ 9.

Second, the email could not serve as an offer that was accepted through the "confirming" Purchase Order. "Price quotations are a daily part of commerce by which products are shopped and commercial transactions initiated. Without more, they amount to an invitation to enter into negotiations, but generally they are not offers that can be accepted to form binding contracts." *Audio Visual Associates, Inc. v. Sharp Electronics Corp.*, 210 F.3d 254, 259 (4th Cir. 2000). Rather, the offer normally takes the form of a purchase order, providing product choice, quantity, price and terms of delivery. *Id.*; *Taft-Peirce Manufacturing Co. v. Seagate Tech., Inc.*, 789 F. Supp. 1220, 1223 (D.R.I. 1992) (noting that usually it is the submission of a purchase order by a

---

manufacturer produce the boards. Gray Decl. at ¶ 9. Cogent also proposed a $25,000 fee to provide up to six months of production support for Turbochef, including emails and limited telephone support but no travel. *Id.*

[3] The email and the supposed oral acceptance would have created nothing more than an illusory contract. *See Vulcan Automotive Equipment, Ltd. v. Global Marine Engine & Parts, Inc.*, 240 F. Supp. 2d 156, 159 (D.R.I. 2003) (ruling that a letter exchanged between the buyer and seller in which the seller promised to supply marine engines and parts only to the buyer and the buyer in turn promised to keep its account current and in good standing with the seller was an illusory contract that failed for lack of mutuality of obligation; rather the subsequent purchase orders were the operative contracts).

buyer in response to a price quote that constitutes the offer). Consistent with these principles, the undisputed facts in this case point to only one conclusion: the Purchase Order was an offer, not an acceptance. In particular, the Purchase Order was materially different from Michael Kelly's email. Not only did the Purchase Order reject the "flattened" board approach, the license fee or the support fee, the Purchase contained the additional, critical condition that had not been previously discussed in the email -- that the 500 boards would have to be designed and produced by April 1, 2006, and that the remainder would be produced within a year's time. Given the conflicting proposals in the email and the new critical requirement of early completion dates, the only conclusion is that the Purchase Order served as the offer of what Turbochef was willing to purchase and under what terms – not as confirmation of a firm and definite offer or of a contract already made. *See Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*, 217 Ga. App. 530, 531, 458 S.E.2d 170, 171 (Ga. App. 1995) (the first requirement of a valid contract is that there be a meeting of the minds of the parties and mutuality). This is further confirmed by the Declaration of Turbochef's Terry Gray, who states, without dispute, that he had no authority to approve any of the proposals in Michael Kelly's email, particularly given the large amount of money at issue. Gray Decl. at ¶ 11.

Moreover, neither the alleged "oral acceptance" nor the Purchase Order created a valid, enforceable contract because a condition precedent had yet to be fulfilled – that is, the receipt of the upfront fee. *See Athens Heart Center v. Brasstown Valley Resort, Inc.*, 275 Ga. App. 607, 608, 621 S.E.2d 565, 566 (Ga. App. 2005) ("'Where a contract is contingent on the meeting of some condition, it is not enforceable by either party until the condition has been met.'") (quoting *Moore v. Buiso*, 235 Ga. 730, 731, 221 S.E.2d 414 (1975)). It is undisputed that any deal between the parties was subject to Cogent's receipt of the upfront money of $89,500. The

Purchase Order itself said as much: "Turbochef will pre-pay for the first 500 of each board totaling $89,500." Kelly Aff., Exh. 2. In fact, that was a requirement imposed by *Cogent*. Kelly Aff., Exh. 1 ("The first 500 would be prepaid at the start in order to fund the custom target.") Thus, until that occurred on January 26, 2006, there was no enforceable contract. When it did occur, the corrected Purchase Order with the Additional Terms and Condition had arrived on the same day, making this latter agreement the only valid and enforceable contract between the parties.

In short, Michael Kelly's email was not an offer that Turbochef accepted as a matter of law. Hence, Cogent's argument that the email forms the contract and cannot be modified by the later corrected Purchase Order and Additional Terms and Conditions lacks any merit.

B. Cogent Had Notice Of And Received The Corrected Purchase Order

Cogent also argues that the corrected Purchase Order with the Additional Terms and Conditions does not control here because Cogent had no notice of and never received this second Purchase Order. This argument lacks any merit.

To be sure, Cogent disputes that Michael Kelly was told by April McLain that another Purchase Order with a second authorized signature would be coming. Kelly Aff. at ¶ 7. Cogent even disputes, without explanation, that Kelly received from April McLain the fax cover sheet accompanying the original Purchase Order indicating: "Once I [April McLain] have the second signature, I will re-fax the PO to you." McLain Decl. at ¶ 7, Exh. 1.[4] What Cogent cannot dispute, however, is the document it submitted in its opposition showing that it expected to receive another purchase order on or after January 25, 2006. *Id.*, Exh. 3. In order to confirm for Michael Kelly that the $89,500 check would arrive on January 26, 2006, Terry Gray forwarded

[4] Yet, the first Purchase Order, on its face, indicates at the top right hand corner that it is page 2 of a multi-page fax. Kelly Aff., Exh. 2.

to him on January 25, 2006 a string of internal Turbochef emails about the payment. The string of emails is attached to Mr. Kelly's affidavit at Exhibit 3. In one of those emails, dated *January 25, 2006*, a week after Cogent received the first Purchase Order, Turbochef's Miguel Fernandez makes clear that Turbochef would be sending a purchase order to Cogent: "Ok. We will issue po today." *Id*., Exh. 3. Thus, Cogent would have known from the emails Terry Gray forwarded to Michael Kelly that Cogent would be receiving a purchase order on or about January 25, 2006. *Id*.; Gray Decl. at ¶ 17. In fact, April McLain tried to send the Purchase Order and Additional Terms and Conditions on January 25, 2006 and succeeded the next day. Gray Decl. at ¶¶ 15-16; McLain Decl. at ¶ 10.

While Michael Kelly claims that Cogent was not aware of the Purchase Order with the Additional Terms and Conditions because he never received them (Kelly Aff. at ¶¶ 10, 15), Cogent does not make any attempt, beyond sheer speculation, to explain or rebut Turbochef's fax confirmation unequivocally showing that the corrected Purchase Order and the Additional Terms and Conditions were successfully transmitted to Cogent on January 26, 2006 using Cogent's correct fax number. McLain Decl. at ¶ 10 & Exh. 2.[5] Cogent does not dispute that Turbochef used Cogent's correct fax number or that Turbochef has a confirmation that establishes the corrected Purchase Order was successfully transmitted to Cogent. Indeed, Cogent does not explain how Turbochef could have a fax confirmation if the fax did not go through to Cogent. At best, Michael Kelly's Affidavit establishes only that *he* did not receive the facsimile – not that Cogent did not. Kelly Aff. at ¶ 10 ("*I* never received a subsequent purchase order from

---

[5] Michael Kelly asserts generally, and without elaboration, that Cogent experienced various malfunctions with its stand-alone fax machine and speculates it is possible Turbochef may have sent documents that Cogent never actually received. Kelly Aff. at ¶ 11. This speculation does not explain how Turbochef would have a confirmation that the fax did go through to Cogent. Simply put, Turbochef would not possess a confirmation if there was a problem with the fax machine.

Turbochef . . .") (emphasis added). Noticeably absent from Cogent's submission is any evidentiary proffer from a records keeper or someone else that Cogent ever performed a search of its records to verify if anyone had received the fax. In point of fact, it just appears that Cogent cannot account for the fax after the fact – that is, after Cogent had received it.

Thus, on the undisputed evidence, Cogent received the corrected Purchase Order and the Additional Terms and Conditions.

C. Under Georgia Law, Cogent Is Bound By The Arbitration Provision

In light of the foregoing, the undisputed facts establish that there is an enforceable contract between Cogent and Turbochef under Georgia law which consists of the corrected Purchase Order and the Additional Terms and Conditions. Thus, pursuant to Paragraph 16 of the Additional Terms, Cogent is required to arbitrate this dispute.

Article 2 of the Georgia Uniform Commercial Code, Sales ("UCC"), controls the disposition in this matter because indisputably we are here concerned with "merchants" of "goods" under the UCC. Georgia UCC § 11-2-102 (chapter 2 applies to transactions in goods); 11-2-104(1) (defining "merchant" as a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction); 11-2-105 (defining "goods" as all things which are movable at the time of identification to the contract for sale).

Under the Georgia UCC, "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Georgia UCC § 11-2-204(1). Thus, an offer to make a contract can be in the form of a purchase order for goods or services sent to a merchant or a manufacturer. An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium

reasonable in the circumstances. Georgia UCC § 11-2-206(1)(a). For instance, the offer can be accepted through the commencement of performance. Georgia UCC § 11-2-206(2) & comment 3. The offer also may be accepted by promptly promising to ship or by the prompt or current shipment of goods. Georgia UCC § 11-2-206(1)(b).

In this case, the undisputed facts establish that, after receiving Michael Kelly's email containing two separate and distinct proposals, each lacking key terms, Turbochef determined internally what offer it wished to make and then subsequently did so by fax in the form of Purchase Order No. PO600090 on January 19, 2006. Kelly Aff. at ¶ 4 & Exhs. 1 & 2, McLain Decl. at ¶ 7 & Exh. 1; Gray Decl. at ¶¶ 7-9, 11-12. A key provision of the Purchase Order was that Cogent would deliver the first 500 boards to Turbochef by no later than April 1, 2006, but that any deal was contingent upon Cogent receiving from Turbochef, up front, a payment of $89,500. Kelly Aff., Exh. 1 & 2, McLain Decl. at ¶¶ 7-8 & Exh. 1; Gray Decl. at ¶ 12. Very quickly after faxing the Purchase Order to Cogent, April McLain learned that the Purchase Order that was faxed was incomplete and had inadvertently omitted language indicating the Purchase Order was subject to additional terms and conditions and would not constitute an offer to buy in the absence of such terms and conditions. McLain Decl. at ¶ 9. On January 25, 2006, Michael Kelly was aware that a Purchase Order would be coming from Turbochef. Kelly Aff. at ¶ 7, Exh. 3; Gray Decl. at ¶ 17. On January 26, 2006, McLain faxed to Michael Kelly the corrected Purchase Order including the Additional Terms and Conditions. McLain Decl. at ¶ 10 & Exh. 2; Gray Decl. at ¶¶ 14, 16 & Exh. 1.

The corrected Purchase Order provided on the front page that it was an offer but only if the applicable Additional Terms and Conditions were included. McLain Decl. at ¶ 12 & Exh. 2. The Additional Terms and Conditions confirmed that the Purchase Order was an "offer" that

could be accepted through Cogent beginning work. *Id*. Specifically, Section 1, entitled "Acceptance and Agreement," provided:

> Acceptance of Buyer's offer to purchase the Goods and services hereunder is hereby expressly limited to Vendor's agreement to the terms and conditions contained herein on the face of this Order. If Vendor's quotation, acknowledgment, confirmation, invoice or other form states terms additional to or different from those set forth herein, then those terms are deemed to materially alter Buyer's offer and this writing shall be deemed objection to and rejection of such additional and/or different terms. No modification or waiver of these terms and conditions shall be effective unless in writing and signed by a Vice President or above (or equivalent) of Buyer. *Any of the following acts shall constitute an acceptance of Buyer's offer to purchase the Goods or services on the terms and conditions contained herein and on the face of this Order:* (a) the return of an acknowledgment copy of this Order executed by Vendor; (b) Vendor's deliver to Buyer of a sales acknowledgement or other writing, referencing or acknowledging receipt of the Order or agreeing to the description of the Goods and services and the price quantity terms and delivery schedule appearing on the face of this Order or (c) *Vendor's commencement of performance of services or shipment of the Goods.* If this Order shall be deemed an acceptance of a prior offer by Vendor, such acceptance is limited to the express terms contained herein and on the face of this Order. Additional or different terms or any attempt by Vendor to vary in any degree any of the terms of this Order shall be deemed material and are objected to and rejected, but this Order shall not operate as a rejection of the Vendor's offer unless it contains variances in the terms of the description, quantity, price or delivery schedule of the Goods. *Id*. (emphasis added).

At Cogent's own request, the Purchase Order was not effective until a condition precedent had been achieved – Cogent receiving payment of the upfront money, which occurred on January 26, 2006, the same day that Ms. McLain faxed the corrected Purchase Order and the Additional Terms and Conditions to Cogent. Kelly Aff. at ¶ 8; McLain Decl. at ¶ 15. Thereafter, Cogent accepted the Purchase Order and the Additional Terms and Conditions by failing to object, by depositing the check and by working to fulfill the requirements of the Purchase Order. Georgia UCC § 11-2-206(1)(b); § 11-2-206(2) & comment 3. An agreement to arbitrate need not be signed by the party to be charged in order to be enforceable. *Dixie Aluminum Products Co. v. Mitsubishi Int'l Corp.*, 785 F. Supp. 157, 159 (N.D. Ga. 1992) (ruling

that seller's confirmation containing arbitration provision was binding upon buyer when buyer never objected to arbitration clause).

The two cases principally relied upon by Cogent -- both under Rhode Island law -- are distinguishable. In *A.T. Cross Co. v. Royal Selangor(s) PTE, Ltd.*, 217 F. Supp.2d 229 (D.R.I. 2002), the course of the parties' written communications and discussions clearly showed there was no meeting of the minds as to the arbitration provision. In particular, the arbitration clause was contained in the first draft agreement, the clause was never agreed upon, and subsequent negotiations and written communications indicated this was still an outstanding issue and subject to debate. *Id*. at 231-32, 236-37. As Judge Lagueux summarized, "the evidence not only shows lack of signatures but also on-going negotiations that featured disputed terms relating to the arbitration agreement." *Id*. at 237. Thus, among other arguments, this Court rejected the assertion that performance alone, in the face of an ongoing dispute about arbitration, created an implied-in-fact contract to arbitrate. *Id*. at 236-37. Here, by contrast, Cogent never disputed or engaged in further negotiations regarding the arbitration provision; rather, it accepted Turbochef's deposit and began work.

The Rhode Island Supreme Court's decision in *Stanley-Bostitch, Inc. v. Regenerative Environmental Equipment Co.*, 697 A.2d 323 (R.I. 1997), is even less applicable. There, the Court held that an arbitration provision in the seller's offer was not controlling because it directly conflicted with the provision embodied in the buyer's acceptance that disputes would be resolved in court, and the buyer had had an opportunity to confirm the arbitration provision and specifically did not do so (unlike a prior time). *Id*. at 327. There is no such circumstances in this case.

Thus, there has been an offer and acceptance of the corrected Purchase Order and the Additional Terms and Conditions, and therefore Cogent is bound by the arbitration provision.[6]

D. Georgia UCC § 2-207 Does Not Bar Enforcement Of The Arbitration Provision

Cogent argues, alternatively, that "even if this Court were to find that the Amended Purchase Order was the operative acceptance, or the operative offer which was accepted by Cogent's performance, the arbitration provision is nevertheless not part of the contract" pursuant to UCC 2-207. This argument is without merit.

UCC § 2-207 address the "battle of the forms" situation where the buyer and the seller either have conflicting terms in their forms or one party has additional terms in its form. UCC § 2-207 trumps the common law "mirror image" rule which provided in such situations that there was no contract. Rather, under UCC § 2-207, a contract is formed and the different or additional terms are dealt with in accordance with UCC § 2-207.

Here, as Turbochef asserts, if the corrected Purchase Order is an offer which was accepted by Cogent's performance, Georgia UCC § 11-2-207 is inapplicable. There is no "battle of the forms" – there is only one form – the corrected Purchase Order and the Additional Terms and Conditions.

Even assuming, *arguendo*, that Turbochef's corrected Purchase Order is, as Cogent alleges, an "acceptance" of an earlier offer by Cogent (*i.e.*, Michael Kelly's email), the Additional Terms and Conditions are still part of the contract under Georgia UCC § 11-2-207. Under § 11-2-207(2), the additional terms become part of the contract unless the offer expressly limits acceptance to the terms of the offer, the additional terms materially alter the offer, or notification of objection to the additional terms has already been given or is given within a

[6] Even if this corrected Purchase Order were a modification of an existing contract, no consideration would be needed for the contract to be binding. Georgia UCC § 11-2-209(a).

reasonable time after notice of them is received. None of these exceptions applies. Michael Kelly's alleged email offer does not "expressly limit acceptance to the terms of the offer." The arbitration provision, under Georgia law, is not a material alteration. *See, e.g., Dixie Aluminum Products Co. v. Mitsubishi Int'l Corp.*, 785 F. Supp. 157, 160 (N.D. Ga. 1992) (ruling that arbitration provision is not a material alteration under Georgia UCC § 11-2-207(2)(b)).[7] And Cogent did not object to the Additional Terms and Conditions at any time. Rather, on the same day, Cogent received Turbochef's check, deposited the check and began work. Thus, even under Cogent's scenario, the Additional Terms and Conditions become a part of the contract under Georgia UCC § 11-2-207. As the comment to § 2-207 states, "If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to." Georgia UCC § 2-207, comment 6.[8]

E. <u>The Doctrine of Mistake Is Inapplicable Here</u>

Cogent second alternative argument is that any failure on Turbochef's part to include the arbitration provision in the January 18, 2006 Purchase Order was a unilateral mistake which does not require reformation of the contract. However, the doctrine of mistake is inapplicable. That doctrine applies when the terms of a contract do not accurately reflect the intentions of one party or more parties to a contract. When the contract inaccurately reflects the intentions of both

---

[7] To the extent *Stanley-Bostitch, Inc. v. Regenerative Environmental Equipment Co.*, 697 A.2d 323 (R.I. 1997), stands for the proposition that an arbitration clause is always a material alteration of a contract, it is inconsistent with Georgia law.

[8] Moreover, the corrected Purchase Order – assuming it is considered an acceptance – was "expressly made conditional on assent to the additional or different terms" (Georgia UCC § 11-2-207(1)) in both the front of the Purchase Order ("This Purchase Order is subject to additional terms and conditions (often presented on the reverse side) and will not constitute an offer to buy in the absence of such terms and conditions."), and in Paragraph 1 of the Additional Terms and Conditions ("If this Order shall be deemed an acceptance of a prior offer by Vendor, such acceptance is limited to the express terms contained herein and on the face of this Order."). Thus, under Georgia UCC § 11-2-207, accepting Cogent's argument would mean there would be no contract absent the Additional Terms and Conditions. This language is markedly different from the less explicit contract language at issue in *Taft-Peirce Manufacturing Co. v. Seagate Tech., Inc.*, 789 F. Supp. 1220 (D.R.I. 1992), and *Stanley-Bostitch, Inc. v. Regenerative Environmental Equipment Co.*, 697 A.2d 323 (R.I. 1997).

parties, then the doctrine of mutual mistake is relevant. Here, as discussed above, the undisputed facts show that the only operative contract is the corrected Purchase Order with the Additional Terms and Conditions so no mistake has occurred.

Moreover, even if the Court considers the original Purchase Order, Turbochef corrected its error in the second Purchase Order within a week's time. This is not a case where the only operative contract fails to reflect Turbochef's intentions and no correction was made to the contract. The doctrine of mistake is inapplicable in these circumstances because there is nothing to reform.

Lastly, even assuming *arguendo* the doctrine of mistake were applicable, under Georgia law, "equity will rescind a contract upon a unilateral mistake." *First Baptist Church of Moultrie v. Barber Contracting Co.*, 189 Ga. App. 804, 806, 377 S.E.2d 717, 719 (Ga. App. 1989). Where, as here, notification of the mistake was promptly made and corrected, and that mistake was an honest one made in good faith, the doctrine applies to reform the contract. *Id*. at 808, 377 S.E.2d at 720-21.

## II. ALTERNATIVELY, TURBOCHEF'S MOTION SHOULD BE HELD IN ABEYANCE PENDING A TRIAL ON WHETHER THERE IS AN AGREEMENT TO ARBITRATE

Assuming *arguendo* that the Court concludes there is a factual dispute as to whether there was an agreement to arbitrate -- particularly, whether Cogent ever received the corrected Purchase Order -- the Court should hold Turbochef's motion in abeyance pending a trial on the issue of whether there was an agreement to arbitrate. As noted above, courts addressing a motion to dismiss and compel arbitration have employed a Rule 56 summary judgment standard. *See, e.g., Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002); *Smarttext Corp. v. Interland, Inc.*, 296 F. Supp.2d 1257, 1262-

63 (D. Kan. 2003) (collecting cases); *Brown v. Dorsey & Whitney, LLP*, 267 F. Supp.2d 61, 66-67 (D.D.C. 2003). When applying that standard, if there is a genuine issue of material fact, then the Federal Arbitration Act requires a trial on whether there was an agreement to arbitrate. *Smarttext Corp.*, 296 F. Supp.2d at 1263. 9 U.S.C. § 4 provides that if the making of an arbitration agreement is seriously disputed, "the court shall proceed summarily to the trial thereof." *See, e.g., Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980); *Smarttext Corp.*, 296 F. Supp.2d at 1263.

In this case, the extensive facts presented by Turbochef through the Declarations of April McLain and Terry Gray establish that the only operative contract is the corrected Purchase Order and the Additional Terms and Conditions because: 1) Terry Gray had no authority to approve an alleged email "offer" from Michael Kelly, particularly given the large amount of money at stake, and made clear to Kelly that Turbochef would present an offer to Cogent through a purchase order; 2) Terry Gray told Kelly that any proposal would have to be subject to internal review and that a purchase order would have to be issued setting forth what Turbochef was offering to purchase; 3) April McLain made clear to Cogent that two authorizations were required for the Purchase Order to be effective and that the first Purchase Order did not have both signatures and a second one would be sent; 4) Michael Kelly was told through a string of emails that a second purchase order would be coming on or about January 25, 2006; 5) the corrected Purchase Order and the Additional Terms and Conditions were faxed to and received by Cogent on January 26, 2006; 6) the corrected Purchase Order and Additional Terms and Conditions arrived the same day the contractual condition precedent insisted upon by Cogent -- the upfront money of $89,500 -- was received by Cogent; 7) the corrected Purchase Order made clear it was an offer and would not be enforceable without the Additional Terms and Conditions; 8) the Additional Terms and

Conditions made clear that Cogent could accept the Purchase Order by beginning performance of services; and 9) Cogent deposited the $89,500 check, began work and never complained about the Additional Terms and Conditions including the arbitration provision or forum selection clause. However, if the Court concludes that Michael Kelly's assertion in his affidavit that *he* did not receive the corrected Purchase Order is, alone, sufficient to create a genuine issue that *Cogent* did not receive it, then a trial is required, after discovery, on whether there is an agreement to arbitrate.

A case on point is *PHD, Inc. v. Coast Business Credit*, 147 F. Supp.2d 809 (N.D. Ohio 2001). There, a buyer brought a declaratory judgment action against the seller's secured creditor after the seller filed Chapter 11 bankruptcy, alleging the buyer was entitled to recoupment of certain amounts pursuant to contracts between the buyer and seller. In one particular aspect of the case, the buyer issued a purchase order to the seller to purchase MegaDuster products. *Id*. at 813. On the same day the purchase order was issued, the buyer allegedly contacted the seller and told the seller there were errors in the purchase order and issued an amended purchase order. *Id*. In declarations from multiple former employees of the seller, the seller claimed it never received the amended purchase orders. *Id*. The court concluded that, since the parties presented different versions of the events pertaining to the alleged amended purchase order for the MegaDusters, the different versions raised issues of fact for a jury. *Id*. at 819-20. Accordingly, summary judgment was denied and a trial was required.[9]

[9] The *PHD* case differs from the undisputed facts here because there was no objective confirmation in *PHD* that the seller had in fact received the corrected purchase order, whereas in this case Turbochef has produced the fax confirmation. Additionally, the seller in *PHD* provided multiple affidavits indicating the seller never received the amended purchase order, whereas here Cogent has only supplied a single affidavit indicating Mr. Kelly *himself* did not receive the fax.

On the basis of the foregoing, if the Court concludes there is a genuine issue of material fact as to whether there was an agreement to arbitrate, Turbochef's motion should be held in abeyance and a trial held, after appropriate discovery, on whether there was such an agreement. *Smarttext Corp.*, 296 F. Supp.2d at 1258. If the jury finds that an agreement was made, then Turbochef's motion should be granted and the parties should proceed to arbitration in Georgia in accordance with the forum selection clause. *Id*. If the jury finds there is no such agreement, then the motion can be denied.

**CONCLUSION**

For the foregoing reasons, Turbochef respectfully requests that the Court dismiss (or alternatively stay) Cogent's complaint and compel the parties to arbitration.

Date: September 12, 2006

Respectfully submitted,

/s/ *David A. Wollin*

David A. Wollin, #4950
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: 401-274-7200
Fax: 401-351-4607
dwollin@apslaw.com

*Attorneys for Defendant Turbochef Technologies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of September, 2006, I did send a true copy of the within document by electronic means (ECF) to:

Peter P.D. Leach, Esq.
One Charles Street
Providence, RI 02904

Christine M. Curley, Esq.
275 Beacon Drive
North Kingstown, RI 02852

/s/ *David A. Wollin*

*392479_1.doc*