UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COGENT COMPUTER SYSTEMS, INC. | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 06-280 S |
| TURBOCHEF TECHNOLOGIES, INC. | : | |
| Defendant. | : | |

DECLARATION OF TERRY GRAY

Terry Gray, as his declaration under penalty of perjury pursuant to 28 U.S.C. §1746, states as follows:

1. I am Director of Imbedded and Hardware Controls for Turbochef, a pioneer in the rapidly emerging world of speed cooking.

2. As Director of Imbedded and Hardware Controls, my job responsibilities primarily focus on designing electronic controls for Turbochef's residential ovens.

3. I have worked at Turbochef since June 23, 2005 and am located at their Global Operations offices at 4240 International Parkway, Suite 105, Carrollton, Texas.

4. I make this declaration based on my personal knowledge and after reviewing documents in the possession of Turbochef and the Affidavit of Michael J. Kelly.

5. On January 17, 2006, I telephoned Michael Kelly of Cogent Computer Systems, Inc. ("Cogent") to discuss the possibility of Cogent designing and supplying customized micro computers ("boards") to control a customized display Turbochef planned to use for its new residential ovens. This was the first time I had spoken with Mr. Kelly. I did not speak to Mr. Kelly on January 10, 2006.

6. At our January 17, 2006 telephone call, I explained to Mr. Kelly generally what Turbochef was looking for. I told him that we were seeking a microprocessor (ARM 9) controller utilizing an Epson video control which could be used to control the LCD display for a residential oven. Mr. Kelly responded that Cogent had a controller using an Epson video control which could be married to an existing controller interface. I asked Mr. Kelly to send me a proposal outlining what Cogent could provide to us. This conversation was very preliminary and we did not agree on any terms such as pricing, quantity and delivery dates. Moreover, the controller we were seeking had to be designed and produced by Cogent after we provided schematics for the residential ovens Turbochef was building.

7. On January 18, 2006, I received an email from Mr. Kelly which is attached as Exhibit 1 to his Affidavit. The email contained two separate proposals for Turbochef's consideration. The first called for a two-part design consisting of two boards – the first board would be a small board with a microprocessor (ARM 9) and the second board (or custom target board) would have all the components needed to control the oven. The first, smaller board would plug directly into the second custom target board. The two-part design is reflected in items 1 through 3 in Mr. Kelly's email. He was proposing a price for the two-part board design of $149 each plus the unspecified actual cost for the custom target board and parts (referenced as "PCB" in the email). This two-part design would be delivered in lots of 500. However, under this first proposal, Turbochef would have to prepay the cost of the first 500 before Cogent would agree to begin the work. Cogent insisted on the prepayment at the start in order to fund the target of the first 500 custom built boards. This prepayment was in lieu of a non-recurring engineering fee (NRE) for design and engineering work. Thereafter, each additional lot of 500 would have to be prepaid.

8. Mr. Kelly's email contained a second proposal distinct from the first. The second proposal called for a "flattened" design. This means that the two boards would be combined into a single board or "flattened" out. Mr. Kelly indicated that the design could be "flattened" for an additional fee of $25,000 plus unspecified additional costs for the PCB, parts, etc. for up to 25 units. After the design was created, the proposed price for each flattened board was $149. However, the minimum order would be 1,000 units.

9. Mr. Kelly's email also contained additional options for Turbochef's consideration. Cogent was offering to charge a license fee of $125,000 after the first 5,000 units had been produced. This was an "intellectual property" fee that would allow Turbochef to purchase the design if we wanted to have another manufacturer produce the boards. Cogent also proposed a $25,000 fee to provide up to six months of production support for Turbochef, including emails and limited telephone support but no travel.

10. In a subsequent email, Mr. Kelly proposed a maximum fee of $30 for the custom target board and parts.

11. Later that day, I spoke to Mr. Kelly and told him that we would consider Cogent's competing proposals internally at Turbochef and get back to him. I told him that any proposal would have to be subject to internal review and that a purchase order would have to be issued setting forth what Turbochef was offering to purchase. I had no authority to approve any of the proposals in his email, particularly given the large amount of money at issue, and at no time did I ever accept any of Cogent's proposals on any telephone call I had with Mr. Kelly. In particular, I needed to discuss the proposals with Max J. Abbott, Senior Vice President for Turbochef's Residential Division, and seek his consent and approval, along with that of Miguel Fernandez, Vice President of Finance & Controller.

12. Ultimately, given the time constraints in which Turbochef was operating to produce a working oven for the residential market, I recommended that Turbochef proceed with the first proposal for a two-board design but insisted that the first 500 boards be produced by April 1, 2006, with the remaining 4,500 boards delivered over a period of one year. We understood that Cogent would not begin work until we prepaid for the first 500 boards at a total of $89,500. We also decided internally at Turbochef against paying Cogent a $125,000 license fee or a $25,000 support fee. I received the approval of Max Abbottt and Miguel Fernandez. I then asked April McLain, who is responsible for writing purchase orders for the commercial and residential divisions, to send a purchase order to Cogent reflecting what we were offering to purchase. I did not see the first purchase order she sent out to Cogent.

13. On January 25, 2006, I received a telephone call from Michael Kelly that he had not received a copy of the original purchase order through his computer-based fax machine or the $89,500 prepayment for the first 500 boards. He said the purchase order might have printed out on the regular fax machine, but he had not seen it arrive on his computer. I told him that we would resend it, along with the prepayment.

14. That same day, Turbochef's Miguel Fernandez forwarded by email to April McLain and myself Purchase Order No. PO600090 and Additional Terms and Conditions for transmittal to Cogent. Exhibit 1 is the signed Purchase Order No. PO600090 and Additional Terms and Conditions that I received from Mr. Fernandez.

15. Ms. McLain called me to say when she tried to fax the purchase order to Michael Kelly, the fax would not go through. I called Mr. Kelly and told him about the problem. Mr. Kelly told me that he would reset Cogent's fax machine and asked that the purchase order be

refaxed again. I told Ms. McLain of my conversation with Mr. Kelly and asked that she refax the purchase order to Cogent.

16. It is my understanding that Ms. McLain successfully faxed Purchase Order No. PO600090 and the Additional Terms and Conditions, Exhibit 1 attached hereto, to Mr. Kelly the next day, January 26, 2006.

17. In addition, at my request, the prepayment of $89,500, which was a condition of Cogent's agreement with Turbochef, was sent by Federal Express so as to arrive at Cogent on January 26, 2006. In order to confirm for Michael Kelly that the check would arrive on January 26, 2006, I forwarded to him on January 25, 2006 a string of internal emails at Turbochef about the payment. The string of emails is attached to Mr. Kelly's affidavit at Exhibit 3. In one of those emails, dated January 25, 2006 from Miguel Fernandez to me, Mr. Fernandez makes clear that we would be sending a purchase order to Cogent. Thus, Mr. Kelly would have known from the emails I forwarded to him that he would be receiving a purchase order on or about January 25, 2006. In fact, Ms. McLain tried to send Purchase Order No. PO600090 and Additional Terms and Conditions on January 25, 2006 and succeeded the next day after my conversation with Mr. Kelly.

18. After being sent the Purchase Order No. PO600090 and the $89,500 check, Cogent never objected to any of the terms of the Purchase Order, including the Additional Terms and Conditions. Rather, they worked to fulfill the requirements of the Purchase Order.

19. Cogent failed to produce the 500 boards by April 1, 2006 and has never done so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11-SEP-06

Terry Gray

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of September, 2006, I did send a true copy of the within document by electronic means (ECF) to:

Peter P.D. Leach, Esq.
One Charles Street
Providence, RI 02904

Christine M. Curley, Esq.
275 Beacon Drive
North Kingstown, RI 02852

/s/ *David A. Wollin*

392046_1.doc