UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COGENT COMPUTER SYSTEMS, INC., Plaintiff, | : | |
| v. | : | CA 06-280 S |
| TURBOCHEF TECHNOLOGIES, INC., Defendant. | : | |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court is Defendant Turbochef Technologies, Inc.'s Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration (Document ("Doc.") #4) ("Motion" or "Motion to Dismiss or Stay"). By the Motion, Defendant Turbochef Technologies, Inc. ("Turbochef" or "Defendant"), seeks to dismiss the instant lawsuit in its entirely or, alternatively, to stay the action and to compel enforcement of a contractual arbitration agreement pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq. The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated herein, I recommend that the Motion be denied.

**Facts and Travel**

Plaintiff Cogent Computer Systems, Inc. ("Plaintiff" or "Cogent"), is a Rhode Island corporation which makes standard and custom electronic micro computer systems. See Complaint ¶ 1. Defendant Turbochef is a Delaware corporation with a principal place of business in Carrolton, Texas. See id. ¶ 2. Turbochef is in the business of manufacturing high end ovens for the commercial market. See id.

Sometime between January 10, 2006, and January 17, 2006,[1] Turbochef's Director of Imbedded and Hardware Controls, Terry Gray ("Gray"), telephoned Cogent's Vice President of Engineering, Michael Kelly ("Kelly"), and discussed the possibility of Cogent designing and supplying customized micro computers ("boards") to control a customized display Turbochef planned to use for its new residential ovens. See Declaration of Terry Gray ("Gray Decl.") ¶ 5. Gray asked Kelly to send him a proposal outlining what Cogent could provide to Turbochef. See id. ¶ 6. On January 18, 2006, Gray received an e-mail from Kelly which contained two separate proposals. See id. ¶ 7. After receiving this e-mail Gray spoke again with Kelly and told him that Turbochef would consider Cogent's proposals and get back to him. See id. ¶ 11. Gray told Kelly that any proposal would have to be subject to internal review and that a purchase order would have to be issued setting forth what Turbochef was offering to purchase. See id.

Following this conversation, Gray discussed Cogent's proposals with Turbochef's Senior Vice President for the Residential Division, Max J. Abbott ("Abbott"). See id. ¶¶ 11-12. The first proposal called for Turbochef to prepay $89,500.00 for the first 500 boards. See id. ¶¶ 7, 12. Because of time constraints, Gray recommended that Turbochef proceed with this proposal, but insist that the first 500 boards be produced by April 1, 2006, and the remaining 4500 boards be delivered over a period of one year. See id. ¶ 12. Abbott accepted Gray's recommendation and approved the purchase. See id. Gray also obtained the approval of Turbochef's Vice President of Finance

[1] Michael Kelly, Cogent's Vice President of Engineering, places the date of the first telephone conversation as on or about January 10, 2006. See Affidavit of Michael J. Kelly ("Kelly Aff.") ¶ 2. Turbochef's Director of Imbedded and Hardware Controls, Terry Gray, states that the first time he spoke with Mr. Kelly was on January 17, 2006, and denies that they spoke on January 10, 2006. See Declaration of Terry Gray ("Gray Decl.") ¶ 5.

and Controller, Miguel Fernandez ("Fernandez"). See Gray Decl. ¶ 12. After receiving the two approvals, Gray directed April McLain ("McLain"), the Turbochef employee responsible for writing purchase orders for the commercial and residential divisions, to send a purchase order to Cogent, reflecting what Turbochef was willing to purchase. See id. It was Turbochef's understanding that Cogent would not begin work until the $89,500.00 prepayment was made. See id.

On or about January 19, 2006, McLain spoke to Kelly and told him that she would be sending him a purchase order for 5,000 boards. Declaration of April McLain ("McLain Decl.") ¶ 6. She also told Kelly that she only had one signature on the purchase order, that of Abbott, and that she would need to have a second signature for the purchase order from Turbochef's corporate headquarters in Atlanta, Georgia. See id. According to McLain, Kelly asked her to send the purchase order right away without waiting for the second signature.[2] See id. McLain faxed to Cogent Purchase Order No. PO600090, dated January 18, 2006 (the "First Purchase Order"), for 5,000 boards.[3] See id. ¶ 7. The fax cover sheet which accompanied that document carried a message directed to Kelly: "Once I have the second signature, I will re-fax the PO to you." Id., Ex. 1 at 1 (Fax Cover Sheet dated 1/19/06). The First Purchase Order indicated that the total price was $895,000.00 and that Turbochef would prepay $89,500.00 for the first 500 boards. See McLain Decl., Exhibit ("Ex.") 1 at

---

[2] Kelly denies that he was told that an additional signature was required from Turbochef in order to proceed with the contract. See Kelly Aff. ¶ 7.

[3] Technically, the Purchase Order was for 5,000 units each of two different boards which plugged together. See Declaration of April McLain ("McLain Decl."), Ex. 1 at 2 ("First Purchase Order"); see also Gray Decl. ¶ 7. However, both parties for the most part refer to the purchase order as being for 5,000 boards, see McLain Decl. ¶ 7; Kelly Aff. ¶ 6, and the Court adopts their terminology.

2 (First Purchase Order).

After receiving the First Purchase Order on January 19, 2006,[4] Cogent began work on the Turbochef design project to fulfill the order. Supplemental Affidavit of Michael J. Kelly ("Kelly Supp. Aff.") ¶ 5. Kelly immediately sent Turbochef a Non-Disclosure Agreement to protect Cogent's design and technical information with respect to the schematics for the single board micro computer to be designed and constructed for Turbochef. See id. Gray, on behalf of Turbochef, executed the Non-Disclosure agreement on January 19, 2006, and faxed it back to Kelly the same day. See id.; Kelly Aff., Ex. 5 at 1 (Hand printed cover sheet), 2 (Non-Disclosure Agreement).

On January 25, 2006, Kelly and Gray had a telephone conversation regarding payment of the $89,500.00.[5] See Gray Decl. ¶ 13; Kelly Supp. Aff. ¶ 4. In order to confirm for Kelly that the check would arrive on January 26, 2006, Gray forwarded to Kelly a string of internal e-mails sent within Turbochef. See Gray Decl. ¶ 17. These e-mails reflected Gray's efforts on January 25 to expedite the payment to Cogent. See id.; see also Kelly Aff., Ex. 3 (e-mails). Among the e-mails was one from Fernandez (Turbochef's V.P. of Finance and Controller) to Gray at 8:49 a.m. on January 25 which stated: "OK. We will

---

[4] Kelly affirms that Cogent received the First Purchase Order "on or about January 18, 2006 ...." Supplemental Affidavit of Michael J. Kelly ("Kelly Supp. Aff.") ¶ 5. McLain states that she faxed the document to Cogent on January 19, 2006. See McLain Decl. ¶ 7. As the copy of the First Purchase Order attached as Ex. 2 to the Kelly Aff. appears to reflect that it was transmitted by fax at 11:18 a.m. on January 19, 2006, the Court uses the latter date.

[5] Gray claims that during this telephone conversation Kelly also stated that he had not received a copy of the purchase order through his computer-based fax machine. See Gray Decl. ¶ 13. According to Gray, he told Kelly that he would resend the purchase order along with the prepayment. See id. Kelly disputes this. See Kelly Supp. Aff. ¶ 4. He states that their conversation "concerned the timing of the payment of the $89,500.00 deposit." Kelly Supp. Aff. ¶ 4.

issue po today." Kelly Aff., Ex. 3 at 2. Gray responded at 10:22 a.m.:

> Thanks...now, when exactly will the pre-payment check for the first 500 boards from Cogent be cut? Remembering that the pre-payment is in lieu of an NRE [non-recurring engineering] fee, and that our schedule is extremely tight...about 30 days to complete the design of the board in order to make an April 1st delivery, it is important for us to expedite getting them the money.

Kelly Aff., Ex. 3 at 2 (first and third alterations in original). Fernandez replied at 11:16 a.m. that "[p]ayment can go out immediately." Id. at 1. At 2:56 p.m., Gray sent Fernandez another e-mail, asking if the check could be "FedEx[ed]." Id. Turbochef issued a check for $89,500.00 that same day, see Kelly Aff., Ex. 4, and sent it to Cogent by Federal Express, see Gray Decl. ¶ 17. Cogent received it on January 26, 2006. See Kelly Aff. ¶ 8; McLain Decl., Ex. 3 (FedEx Delivery Confirmation).

Also on January 26, 2006, McLain faxed to Kelly a second purchase order (the "Second Purchase Order").[6] See McLain Decl. ¶ 10. The Second Purchase Order was essentially the same as the First Purchase Order but with three additions: 1) a printed statement on the face of the document; 2) a second page, and 3) a marking to the right of Abbott's signature.[7] The printed

---

[6] Turbochef refers to the second purchase order both as "the complete Purchase Order No. PO600090," Defendant Turbochef Technologies, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration ("Defendant's Mem.") at 2, and "the corrected Purchase Order," id. at 4. Cogent refers to it as "the Amended Purchase Order." See Memorandum in Support of Opposition to Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration ("Plaintiff's Mem.") at 2, 3. For simplicity, the Court identifies it as the Second Purchase Order.

[7] The marking is not plainly recognizable as a second signature. See Declaration of April McLain, Ex. 2 (Second Purchase Order) at 2. This contrasts with subsequent purchase orders which Cogent received from Turbochef dated February 23, March 6, and May 2, 2006. Each of

statement on the face of the document is reproduced below:

> This Purchase Order is not effective until signed by an authorized representative of TurboChef Technologies, Inc. This Purchase Order is subject to additional terms and conditions (often presented on the reverse side) and will not constitute an offer to buy in the absence of such terms and conditions.

McLain Decl., Ex. 2 (Second Purchase Order) at 3. The second page bears the heading "ADDITIONAL TERMS AND CONDITIONS (Reverse Side of Purchase Order)." id. at 4, and it contains twenty-three paragraphs of very small print, see id. (Hereafter the Court refers to this second page as the "Additional Terms.") Paragraph 16 is entitled "Arbitration" and provides in part that any controversy relating to the order shall, at the buyer's option, be resolved by arbitration in Atlanta, Georgia, pursuant to the Rules of the American Arbitration Association. Id. Paragraph 21 is entitled "Governing Law," id., and states that: "This Order and the construction of the provisions hereof shall be construed and interpreted in accordance with the laws of the State of Georgia, including the Georgia Uniform Commercial Code ...." Id.

Turbochef claims that the Second Purchase Order and the Additional Terms were successfully faxed to Cogent on January 26, 2006. See McLain Decl. ¶ 10. In support of this contention, Turbochef has submitted a "fax confirmation," id., which it contends establishes that the corrected Purchase Order was successfully transmitted to Cogent, see id., Ex. 2 (Fax Confirmation); see also Defendant Turbochef Technologies, Inc.'s Reply Brief in Support of Its Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration ("Defendants' Reply") at 10. Cogent denies receiving the Second Purchase

---

these latter documents clearly has two signatures. See Kelly Aff., Ex. 6. The dollar value of these orders was relatively low: $1,500.00. $9,475.00, and $11,970.00. See id.

Order, see Kelly Supp. Aff. ¶ 7, and maintains that it was not aware of the Additional Terms until it received Turbochef's letter of May 9, 2006, attempting to terminate the contract, see Kelly Aff. ¶ 15.

On May 9, 2006, Turbochef sent a letter to Cogent, stating that Cogent had not delivered the first 500 boards by April 1, 2006, and that it was "rescinding and terminating the purchase order, and ... demand[ing] repayment of the amount delivered in prepayment." McLain Decl., Ex. 4 (Letter from Stockwell to Kelly of 5/9/06). Cogent filed the instant action against Turbochef on June 14, 2006, charging it with breach of contract, breach of an implied covenant of good faith and fair dealing, and unjust enrichment. See Complaint ¶¶ 23-36. After receiving an extension of time, Turbochef responded to the lawsuit on August 8, 2006, with the Motion to Dismiss or Stay. A hearing on the Motion was held on October 4, 2006. Thereafter, the Motion was taken under advisement.

**Standard of Review**

Although Turbochef states that the Motion is made pursuant to Fed. R. Civ. P. 12(b)(6), see Defendant's Reply at 1, the parties appear to agree that the question of whether there has been an agreement to arbitrate (which is the issue raised by the Motion) is to be resolved using a summary judgment standard, see id. at 5 ("in the context of determining whether there has been an agreement to arbitrate, a summary judgment standard should apply"); id. at 17 ("courts addressing a motion to dismiss and compel arbitration have employed a Rule 56 summary judgment standard"); Responsive Memorandum in Further Support of Opposition to Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration ("Plaintiff's Response") at 3 ("Cogent acknowledges that the standard of review on [a] motion to compel arbitration is akin to the summary judgment standard.").

The Court concurs that the summary judgment standard is applicable to the Motion. See S & G Elec., Inc. v. Normant Sec. Grp., Inc., Civil Action No. 06-3759, 2007 WL 210517, at *2, (E.D. Pa. Jan. 24, 2007)("A motion to stay litigation and compel arbitration is reviewed under the summary judgment standard of FED. R. CIV. P. 56(c) because the ruling will result in a summary disposition of whether the parties have agreed to arbitrate."); Brown v. Dorsey & Whitney, LLP, 267 F.Supp.2d 61, 67 (D.D.C. 2003)("[I]nasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate[,] consideration of the motion according to the standard used by district courts in resolving summary judgment pursuant to Fed.R.Civ.P. 56(c) ... is appropriate.")(alterations in original)(internal quotation marks omitted); see also Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2nd Cir. 2003)("In the context of motions to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 (2000), the court applies a standard similar to that applicable for a motion for summary judgment."); Salvadori v. Option One Mortgage Corp., 420 F.Supp.2d 349, 353 (D.N.J. 2006)("Motions to compel arbitration are reviewed under the summary judgment standard set forth in Fed. R. Civ. P. 56(c)."); Stein v. Burt-Kuni One, LLC, 396 F.Supp.2d 1211, 1213 (D. Colo. 2005)("A motion to compel arbitration under the Federal Arbitration Act is governed by a standard similar to that governing motions for summary judgment."); Boulet v. Bangor Secs. Inc., 324 F.Supp.2d 120 (D. Me. 2004)("Although the First Circuit has not addressed the question, other courts have held that motions to compel arbitration are subject to the same standard of review as motions for summary judgment."); cf. Tinder v. Pinkerton Sec., 305 F.3d 728, 735 (7th Cir. 2002)(noting that courts have analogized the

evidentiary standard a party seeking to avoid compelled arbitration must meet "to that required of a party opposing summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure").

A party seeking to compel arbitration must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. S & G Elec., Inc. v. Normant Sec. Grp., Inc., 2007 WL 210517, at *2; Salvadori v. Option One Mortgage Corp., 420 F.Supp.2d at 353 (same); Smarttext Corp. v. Interland, Inc., 296 F.Supp.2d 1257, 1262-63 (D. Kan. 2003)(same). The moving party must present evidence sufficient to demonstrate an enforceable arbitration agreement. Stein v. Burt-Kuni One, LLC, 396 F.Supp.2d at 1213; Smarttext v. Interland, Inc., 296 F.Supp.2d at 1263; see also Salvadori v. Option One Mortgage Corp., 420 F.Supp.2d at 353 ("Therefore, the movant must prove through pleadings, depositions, affidavits and answers to interrogatories that they are entitled to judgment as a matter of law."). If this is done, then the burden shifts to the non-moving party to demonstrate a genuine issue of material fact as to the making of the agreement to arbitrate. Stein v. Burt-Kuni One, LLC, 396 F.Supp.2d at 1213; Smarttext v. Interland, Inc., 296 F.Supp.2d at 1263. The Court must consider all of the non-moving party's evidence in the light most favorable to the non-moving party. Salvadori v. Option One Mortgage Corp., 420 F.Supp.2d at 353; Variable Annuity Life Ins. Co. v. Joiner, No. Civ.A. CV206-110, 2006 WL 1737443, at *2 (S.D. Ga. June 23, 2006)("the court must consider all evidence presented by the party opposing arbitration and construe all reasonable inferences in that party's favor"); Brown v. Dorsey & Whitney, LLP, 267 F.Supp.2d at 66-67 ("[T]he district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made between

the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise ....")(internal quotation marks omitted). "In deciding whether the party opposing summary judgment (and by analogy compelled arbitration) has identified a genuine issue of material fact for trial, 'the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.'" Tinder v. Pinkerton Sec., 305 F.3d at 736 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)).

**Arbitrability**

"The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997); see also MCI Telecomms. Corp. v. Exalon Indus., Inc., 138 F.3d 426, 429 (1st Cir. 1998)("[D]etermining whether there is a written agreement to arbitrate the controversy in question is a first and crucial step in any enforcement proceeding before a district court."). A party attempting to compel arbitration "must show that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." Intergen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003); accord Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83, 123 S.Ct. 588, 591 (2002); Intergen N.V. v. Grina, 344 F.3d at 142 (same). "[A] party seeking to substitute an arbital forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate *some* claims." Campbell v. Gen. Dynamics Gov't Sys. Corp., 497 F.3d at 552

(italics in original); McCarthy v. Azure, 22 F.3d 351, 354-55 (1st Cir. 1994)(same).

For the most part, general principles of state contract law control the determination of whether a valid agreement to arbitrate exists. Campbell v. Gen. Dynamics Gov't Sys. Corp., 497 F.3d at 552; see also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924 (1995)("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts.").

**Issue**

As recognized by Turbochef at the hearing on the Motion, there are disputed issues of material fact which prevent the Court from granting the Motion. See Tape of 10/4/06 Hearing. First and foremost is the issue of whether Cogent received the Second Purchase Order and Additional Terms as Turbochef contends, see Defendant's Reply at 11, and Cogent disputes, see Kelly Supp. Aff. ¶¶ 7, 8. Given this circumstance, Turbochef argues that the Court should hold the motion in abeyance and, after appropriate discovery, conduct a trial on the issue of whether there was an agreement to arbitrate. See Tape of 10/4/06 Hearing; see also Defendant's Reply Mem. at 20.

Cogent, on the other hand, maintains that notwithstanding the disputed factual issues, the Motion should be denied because as a matter of law the arbitration provision never became part of the contract. See Plaintiff's Response at 4-5. In other words, Cogent's position is that the instant Motion should be denied because Turbochef is unable to satisfy its initial burden of demonstrating that there is an enforceable arbitration agreement. See Smarttext v. Interland, Inc., 296 F.Supp.2d at 1263 (stating that in context of a motion to compel arbitration, the summary

judgment standard "requires the defendant to present evidence sufficient to demonstrate an enforceable agreement to arbitrate" before burden shifts to plaintiff to demonstrate a genuine issue of material fact); see also Intergen N.V. v. Grina, 344 F.3d at 142; MCI Telecomms. Corp. v. Exalon Indus., Inc., 138 F.3d at 329.

Thus, the issue to be decided is whether the Motion should be held in abeyance pending a trial to determine whether there is a valid arbitration agreement or whether the Motion should be denied outright because as a matter of law Turbochef is unable to show that there was an agreement to arbitrate. Based on the following analysis, the Court finds that Turbochef is unable to show that a valid agreement to arbitrate exists and that the Motion should be denied.

**Findings of Fact**

The Court makes the following findings of fact which are either as alleged by Turbochef or undisputed:[8]

1. On January 17, 2006, Gray of Turbochef telephoned Kelly of Cogent to discuss the possibility of Cogent designing and supplying boards for Turbochef's new residential ovens. See Gray Decl. ¶ 5. Gray asked Kelly to send him a proposal outlining what Cogent could provide to Turbochef. See id. ¶ 6.

2. On January 18, 2006, Gray received an e-mail from Kelly which contained two separate proposals. See id. ¶ 7. After receiving this e-mail Gray spoke again with Kelly and told him that Turbochef would consider Cogent's proposals and get back to him. See id. ¶ 11. Gray told Kelly that any proposal would have to be subject to internal review and that a purchase order would have to be issued setting forth what Turbochef was offering to

[8] As to those facts which the Court finds as alleged by Turbochef, such finding is made solely for the purpose of deciding the instant Motion.

purchase. See Gray Decl. ¶ 11.

3. Following this conversation, Gray discussed Cogent's proposals with Abbott (Turbochef's Senior Vice President for the Residential Division). See id. ¶¶ 11-12. The first proposal called for Turbochef to prepay $89,500.00 for the first 500 boards. See id. ¶ 7, 12. Because of time constraints, Gray recommended that Turbochef proceed with this proposal, but insist that the first 500 boards be produced by April 1, 2006, and the remaining 4500 boards be delivered over a period of one year. See id. ¶ 12. Abbott approved the purchase. See id. Gray also obtained the approval of Fernandez (Turbochef's Vice President of Finance and Controller). See id. It was Turbochef's understanding that Cogent would not begin work until the $89,500.00 prepayment was made. See id.

4. After receiving the two approvals, Gray asked McLain to send the First Purchase Order to Cogent, reflecting what Turbochef was willing to purchase. See id.

5. On or about January 19, 2006, McLain spoke with Kelly and told him that she would be sending him a purchase order for 5,000 boards, but that she only had one signature on the purchase order, that of Abbott, and that she would need to have a second signature for this purchase order from Turbochef's corporate headquarters in Atlanta, Georgia. See McLain Decl. ¶ 6. Kelly asked McLain to send the Purchase Order right away without waiting for the second signature. See id.

6. On January 19, 2006, McLain faxed the First Purchase Order to Kelly at Cogent, see id. ¶ 7. The cover sheet which accompanied the First Purchase Order bore the message: "Once I have the second signature I will re-fax the PO to you." Id., Ex. 1 at 1.

7. After receiving the First Purchase Order, Kelly sent the Non-Disclosure Agreement to Turbochef. See Kelly Supp. Aff. ¶ 5.

Gray signed the Non-Disclosure Agreement on behalf of Turbochef and faxed it back to Kelly at 12:35 p.m. on January 19, 2006. See id.

8. On January 25, 2006, Gray sought to expedite the payment of $89,500.00 to Cogent by sending e-mail messages to Fernandez, stating inter alia, that "it is important for us to expedite getting them the money," Kelly Aff., Ex. 3 at 2, and asking whether Turbochef could "FedEx that check, even if it means using the vendor's FedEx number," see id. at 1; see also Gray Decl. ¶ 17.

9. Gray forwarded the above referenced e-mails to Kelly at Cogent in order to confirm that the check of $89,500.00 would arrive on January 26, 2006. See Gray Decl. ¶ 17. Among the e-mails forwarded were two from Fernandez to Gray, stating that "OK. We will issue payment today" and "Payment can go out immediately." Kelly Aff., Ex. 3 at 1-2.

10. On January 25, 2006, Turbochef issued a check in the amount of $89,500.00, and sent it by Federal Express to Cogent. See id., Ex. 4; Gray Decl. ¶ 17.

11. Cogent began work on the TurboChef design project after receiving the First Purchase Order and prior to receiving the check for $89,500.00. See Kelly Supp. Aff. ¶5.[9]

---

[9] Technically, Turbochef has neither admitted nor denied Cogent's statement that it began work prior to receipt of the check. This fact was alleged in Kelly's supplemental affidavit which was filed pursuant to the Court's order of September 14, 2006, granting Cogent leave to file a responsive pleading to Defendant's Reply. See Order of 9/14/06 (Doc. #14). However, Kelly affirms that he transmitted the Non-Disclosure Agreement to Gray immediately after Cogent received the First Purchase Order, Kelly Supp. Aff. ¶ 5, and it is undisputed that Gray executed that document on behalf of Turbochef on January 19, 2006, and faxed it back to Kelly at 12:35 p.m. that same day, see Kelly Aff., Ex. 5. The date on which Cogent commenced work is certainly a matter within Kelly's knowledge. See Kelly Aff. ¶¶ 1, 5; Kelly Supp. Aff. ¶¶ 1, 5. Additionally, given the tight schedule, which Turbochef itself recognized and was concerned about, see Kelly Aff., Ex. 3 at 2 (Jan. 25, 2006, e-mails from Gray to Fernandez), the

12. The Second Purchase Order with the Additional Terms arrived at Cogent on January 26, 2006, at 9:41 a.m. See McLain Decl., Ex. 2.

13. The check arrived at Cogent on January 26, 2006, at 11:13 a.m. See McLain Decl. ¶ 15; id., Ex. 3.

14. Turbochef and Cogent are both "merchants" and the boards which were the subject of the First Purchase Order are "goods" as those terms are defined in the Uniform Commercial Code. See Defendant's Reply Mem. at 11; see also R.I. Gen. Laws §§ 6A-2-102 (2001 Reenactment) (stating that chapter 2 applies to transactions in goods), 6A-2-104(1) (2006 Supp.) (defining "merchant"), 6A-2-105(1) (2001 Reenactment) (defining goods); accord Ga. Code Ann. §§ 11-2-102, 11-2-104(1), 11-2-105(1).

**Choice of Law**

In order to apply state contract law to the question of whether a valid agreement to arbitrate exists, the Court must first decide which state law to apply. See Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1288 (10th Cir. 1997)(stating that the district court should have begun its analysis with a choice of law determination and that its failure to do so affected the court's subsequent determinations regarding arbitration term). A federal court sitting in diversity must apply the choice of law rules of the forum in which it sits. Auto Europe, LLC v. Connecticut Indem. Co., 321 F.3d 60, 64 (1st Cir. 2003)(citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 491, 61 S.Ct. 1020, 1021 (1941); Nortek v. Molnar, 36 F.Supp.2d 63, 66 (D.R.I. 1999); see also McCarthy v. Azure, 22 F.3d 351, 356 n.5 (1st Cir.

---

immediate commencement of work by Cogent after receiving the First Purchase Order is consistent with the other undisputed evidence. Nevertheless, if Turbochef actually disputes this fact, in objecting to this Report and Recommendation Turbochef should file an affidavit (or other evidence) supporting its contention that Cogent did not start work until January 26, 2006.

1994)("[I]t is reasonable for a federal court to apply the choice-of-law principles of the forum in order to ascertain what state's substantive law should be consulted.").

"Rhode Island's conflict-of-laws doctrine provides that the law of the state where the contract was executed governs." DeCesare v. Lincoln Benefit Life Co., 852 A.2d 474, 484 (R.I. 2004). "Acceptance of the offer, or the final act which constitute[s] the making of the contract, determines the state of completion." Id. (alteration in original)(internal citations and quotation marks omitted).

Turbochef contends that the First Purchase Order was an offer. See Defendant's Reply at 8 ("the [First] Purchase Order served as the offer of what Turbochef was willing to purchase and under what terms"); see also id. at 12 ("Turbochef determined internally what offer it wished to make and then subsequently did so by fax in the form of Purchase Order No. PO600090 on January 19, 2006."). The Court agrees. Accordingly, I find that the First Purchase Order was an offer.

I further find that Cogent accepted this offer, that it did so prior to January 26, 2006, and that an enforceable contract existed between the parties prior to that date.[10] I reach this

---

[10] Turbochef argues that the First Purchase Order "was not effective until a condition precedent had been achieved — Cogent receiving payment of the upfront money ...." Defendant's Reply at 13. Thus, it contends that there was no enforceable contract until one week later when Cogent received the $89,500.00 on January 26, 2006. See id. at 9, 13. Since that was the same day that the Second Purchase Order was allegedly received by Cogent, Turbochef asserts that "this latter agreement [is] the only valid and enforceable contract between the parties," id.

The Court rejects this argument. The payment of the $89,500.00 was a condition of contract performance, not of contract formation. See Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 43 (1st Cir. 1995) ("A condition precedent is an act which must occur before performance by the other party is due.")(internal quotation marks omitted); id. ("As Professor Corbin explains, '[c]onditions precedent ... are those facts and events occurring *subsequently* to the making of a valid contract, that must exist or occur before there is a right to

conclusion for two reasons. First, Gray would have had no reason on January 25, 2006, to confirm for Kelly that payment would arrive the next day unless Cogent had communicated in one form or another that the offer contained in the First Purchase Order was acceptable to Cogent.[11] That acceptance had to have occurred in Rhode Island where Cogent is located and where the offer was received. Second, Cogent also accepted the offer by commencing work on the contract. See Kelly Supp. Aff. ¶ 5.

According to Rhode Island's conflict-of-laws doctrine, "the law of the state where the contract was executed governs. Acceptance of the offer, or the final act which constitute[s] the making of the contract, determines the state of completion."

---

immediate performance, before there is a breach of contract, before the usual judicial remedies are available.'")(quoting 3 A.L. Corbin, Corbin on Contracts § 628 (1960))(alterations in original); see also Unum v. Life Ins. Co. of America, 526 U.S. 358, 369, 119 S.Ct. 1380, 1387 (1999)("Ordinarily, 'failure to comply with conditions precedent ... prevents an action by the defaulting party to enforce the contract.'")(quoting 14 Cal. Jur.3d, Contracts § 245, p. 542 (3d ed. 1974))(alteration in original); Feeco Int'l, Inc. v. Oliver Barrette Millwrights, Inc., No. PC88-0193, 1992 WL 813591, at *2 (R.I. Super. July 31, 1992)("A condition precedent is an event which must occur before a party becomes obligated to perform pursuant to the terms of the contract.")(citing, inter alia, Restatement (Second) of Contracts 224).

Here the payment of the deposit was a condition which Turbochef had to perform before performance by Cogent was due. It was not a condition of contract formation. In addition, the requirement for prepayment was clearly included in the contract for Cogent's benefit. Under contract law a plaintiff may waive a contractual provision established for its benefit, Colonial Penn Ins. Co. v. Bauso, CIV. A. No. 88-5959, 1989 WL 18831, at *5 (E.D. Pa. Mar. 3, 1989), and the defendant has no right to insist on the performance of the condition, MacDonald v. Winfield Corp., 93 F.Supp. 153, 159 (E.D. Pa. 1950).

[11] It cannot be seriously contended that prepayment was necessary to complete Turbochef's offer. The prepayment requirement is stated on the face of the First Purchase Order, the document which Turbochef itself says is the offer. Relatedly, it is beyond belief that Turbochef would send $89,500.00 to Cogent without knowing whether Cogent had accepted the offer contained in the First Purchase Order.

DeCesare v. Lincoln Benefit Life Co., 852 A.2d at 484 (alteration in original)(internal citations and quotation marks omitted); see also Tim Hennigan Co. v. Anthony A. Nunes, Inc., 437 A.2d 1355, 1357 (R.I. 1981)("The rule is well settled that a contract is deemed made at the place where acceptance of the offer took place."). Since the contract was accepted and executed in Rhode Island, Rhode Island law applies to the determination of whether the parties agreed to arbitrate disputes. See DeCesare v. Lincoln Benefit Life Co., 852 A.2d at 484 (stating that because contract was accepted in Nebraska the law of that state applied to the claims of this case).

**Application**

Rhode Island's Uniform Commercial Code ("UCC") provides, in part: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." R.I. Gen. Laws § 6A-2-204(1) (2001 Reenactment). The next subparagraph adds: "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." Id. § 6A-2-204(2). The UCC also states that: "An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances[.]" Id. § 6A-2-206(1)(a).

Applying the above stated law to the facts found by the Court, I find that the First Purchase Order was an offer to make a contract and pursuant to Rhode Island law invited acceptance in any manner and by any medium reasonable. See R.I. Gen. Laws § 6A-2-206. I further find that Cogent accepted Turbochef's offer by communicating its acceptance, in one form or another, to Turbochef and also by commencing performance of the contract, see

id. § 6A-2-206(2) and comment 3.[12] Thus, I conclude that a contract was formed between Turbochef and Cogent prior to January 26, 2006, based on the conduct of both parties which recognized the existence of the contract. See R.I. Gen. Laws § 6A-2-204(1); see also Stanley-Bostitch, Inc. v. Regenerative Envtl. Equip. Co., 697 A.2d 323, 328 (R.I. 1997)("If ... the parties proceed as if they have an agreement, their performance results in the formation of a contract."); UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., 641 A.2d 75, 79 (R.I. 1994)("A contract exists when each party has manifested an objective intent to promise or be bound."). Specifically, I find that the following conduct on the part of Turbochef indicates that it believed that the offer contained in the First Purchase Order had been accepted and that it had entered into a contractual agreement for the purchase and sale of the boards: 1) the execution on January 19, 2006, of the Non-Disclosure Agreement; 2) the sending on January 25, 2006, of internal e-mails from Gray to Fernandez, seeking to expedite payment to Cogent; 3) the forwarding on the same date of those internal e-mails to Kelly at Cogent; and 4) most significantly, the issuance and dispatch on January 25, 2006, to Cogent of the $89,500.00 check.

---

[12] Comment 3 to R.I. Gen. Laws § 6A-2-206 states:

> The beginning of performance by an offeree can be effective as acceptance so as to bind the offeror only if followed within a reasonable time by notice to the offeror. Such a beginning of performance must unambiguously express the offeree's intention to engage himself. For the protection of both parties it is essential that notice follow in due course to constitute acceptance. Nothing in this section however bars the possibility that under the common law performance begun may have an intermediate effect of temporarily barring revocation of the offer, or at the offeror's option, final effect in constituting acceptance.

R.I. Gen. Laws § 6A-2-206 cmt. n.3.

While it is conceivable that a non-disclosure agreement could be executed as part of preliminary discussions preceding the reaching of a contractual arrangement, here the First Purchase Order was complete in terms of price, quantity, and time of performance. Thus, it evidenced a clear meeting of the minds. See Taft-Peirce Mfg. Co. v. Seagate Tech., Inc., 789 F.Supp 1220, 1223 (D.R.I. 1992)(explaining that an "offer must be so definite as to constitute a clear meeting of the minds"). All that remained was for Cogent to accept the offer and commence work. Thus, in the circumstance of this case, the execution of the Non-Disclosure Agreement is evidence of the existence of a contract.

The other three actions by Cogent are even more telling. Gray would have had no reason on January 25, 2006, to seek to expedite payment to Cogent or to forward the e-mails to Kelly "confirm[ing] ... that the check would arrive on January 26, 2006 ...," Gray Decl. ¶ 17, unless Gray knew that Cogent had accepted Turbochef's offer. Similarly, Turbochef would have had no reason to send the check to Cogent on January 25, 2006, unless it believed that Turbochef had entered into a contractual agreement with Cogent and that such act was required under the contract. See Kelly Aff., Ex. 4. These actions demonstrate that Turbochef had a clear intention to contract with Cogent. Cf. Read & Lundy, Inc. v. Washington Trust Co. of Westerly, 840 A.2d 1099, 1102 (R.I. 2004)("An essential element to the formulation of any true contract is an intent to contract.")(internal quotation marks omitted). Indeed, it is virtually impossible to come to any conclusion which would explain Turbochef's actions after the issuance of the First Purchase Order (and prior to January 26, 2006) other than that Turbochef believed an agreement had been reached between the parties and it was commencing performance of its obligation under the contract, namely the prepayment of the

first 500 boards.

With regard to Cogent, I find that the following actions indicate that it recognized the existence of a contract between the parties prior to January 26, 2006: 1) the transmission of the Non-Disclosure Agreement to Turbochef on January 19, 2006, see Kelly Supp. Aff. ¶ 5, and 2) the commencement of work on the Turbochef design project prior to January 26, 2006, see id. Thus, based on the aforementioned conduct of both Turbochef and Cogent, I find that a contract for the sale of goods existed prior to the arrival of the Second Purchase Order on January 26, 2006. See R.I. Gen. Laws § 6A-2-204(2)("An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.").

In reaching this conclusion, the Court has considered whether the statements and/or messages transmitted by Gray and McLain to Kelly prior to January 26, 2006, prevent a finding that a valid contract existed prior to that date. The Court concludes that they do not. Gray's January 18, 2006, statement ("that any proposal would have to be subject to internal review and that a purchase order would have to be issued setting forth what Turbochef was offering to purchase," Gray Decl. ¶ 11), would have conveyed to Kelly only that Turbochef's internal review preceded issuance of the purchase order. It cannot reasonably be viewed as communicating that a purchase order issued after such review would be subject to additional conditions which had not been discussed between the parties. Similarly, McLain's advisement to Kelly (that she would be sending him a purchase order for 5,000 boards but that she needed a second signature, see McLain Decl. ¶¶ 6-7) cannot be viewed as communicating anything more than that this was an administrative detail which McLain required to comply with Turbochef's internal procedures. Finally, even if the prior

statements of Gray and McLain could be viewed as communicating to Cogent that the First Purchase Order was not valid because it lacked a second signature, the e-mails which Gray forwarded to Kelly on January 25, 2006, explicitly notified Cogent that all of Turbochef's internal requirements had been satisfied and that payment and a purchase order with the second signature would be sent. See Kelly Aff., Ex. 3. Thus, Cogent would have had no reason to believe after receiving the e-mails on January 25, 2006, that the First Purchase Order was not a valid offer which invited immediate acceptance. Turbochef's argument that its offer could not be accepted by Cogent until payment was received is unpersuasive. As previously explained, see Choice of Law supra at 16 n.10, the prepayment was a condition of contract performance, not of contract formation. Additionally, it was a condition for Cogent's benefit and could be waived at Cogent's option.

Having determined that a valid contract existed between the parties before the arrival of the Second Purchase Order on January 26, 2006, that document can only be viewed as a proposal to add the Additional Terms to the contract. There is no evidence that Cogent ever agreed to these Additional Terms. See Bourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998) (explaining that modification of an existing contract requires "evidence of mutual assent to the essential terms of the modification and adequate consideration"); Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 92 (R.I. 1992)("[P]arties to a contract can mutually assent to modify a contract if the modification does not violate the law or public policy and the modification is supported by adequate consideration."). Turbochef's argument that Cogent accepted the Additional Terms by failing to object to them, by depositing the check, and by

working to fulfill the requirements of the Second Purchase Order is unpersuasive. See A.T. Cross Co. v. Royal Selangor(s) PTE, Ltd., 217 F.Supp.2d 229, 236 (D.R.I. 2002)("[P]erformance by itself does not evidence acceptance of the arbitration clause.").

Even if the Court were to treat the Second Purchase Order as a written confirmation of the First Purchase Order, as Turbochef appears to advocate, see Defendant's Reply at 13-14, the Court's conclusion is the same. Pursuant to R.I. Gen. Laws § 6A-2-207(2) the Additional Terms are construed as proposals for addition to the contract. Between merchants such terms become part of the contract "unless ... (b) they materially alter it ...." R.I. Gen. Laws § 6A-2-207(2). The Court finds that the Additional Terms, especially the arbitration provision and the choice of law provision,[13] materially alter the contract because it would result in surprise or hardship if incorporated without Cogent's express consent. See id. § 6A-2-207, cmt. n.4; see also Supak & Sons Mfg. Co. v. Pervel Indus., Inc., 593 F.2d 135, 136 (4th Cir. 1979)(noting that "the courts of last resort of both [New York and North Carolina] have held that the addition of an arbitration clause constitutes a Per se material alteration of the contract"). Cogent would have no reason to think that by accepting the offer contained in the First Purchase Order it would be agreeing to give up its right to seek relief in a Rhode Island judicial forum in the event of a dispute with Turbochef or that it would be agreeing to have the contract construed and interpreted according to Georgia and not Rhode Island law. Similarly, requiring Cogent to appear for arbitration in Atlanta,

[13] While the arbitration and choice of law provisions in particular materially alter the contract, the sheer number of additional conditions (compressed into twenty-three paragraphs of very small print) make it virtually impossible to view that document and reach any other conclusion. See McLain Decl., Ex. 2 at 4.

Georgia, is a hardship when Cogent had no reason to believe that this was part of the deal which Gray and Kelly had negotiated. Therefore, the Additional Terms did not become part of the contact because they constituted a material alteration due to surprise and hardship to Cogent.

The case cited by Turbochef, Dixie Aluminum Prods. Co. v. Mitsubishi Int'l Corp., 785 F.Supp. 157 (N.D. Ga. 1992), which found "no unfair surprise," id. at 160, in the addition of an arbitration clause in a confirmation document, is factually distinguishable. In Dixie Aluminum Prods. Co., the parties had engaged in twenty-two transactions over an approximately three year period using the documentation at issue. Id. at 158. In each transaction the parties would reach an agreement concerning the price, quantity, and terms of delivery for steel coils being purchased by the plaintiff. Id. The plaintiff would then send a purchase order containing only the basic terms of the agreement. Id. Before the delivery of the steel under these agreements, the defendant would send a confirming contract of sale to plaintiff. Id. This latter document was much more complete than the purchase order and contained many additional terms, including an arbitration provision. Id. On the front of the confirming contract was a statement which specifically referenced the "provision of arbitration" contained on the reverse side of the document. Id. at 159. That arbitration provision on the back of the document was "labeled in boldface capital letters ...." Id. At the time the dispute between the parties arose, sixteen prior contracts had been performed without objection to the arbitration clause. Id. at 158 n.1. The dispute concerned six subsequent contracts. Dixie Aluminum Prods. Co. v. Mitsubishi Int'l Corp., 785 F.Supp. at 158 n1.

The Dixie Aluminum Prods. Co. court found first that the

confirming documents were the contracts and that their terms, including the arbitration provision, were binding on the plaintiff. Id. at 160. The court found second that even if the confirming document was not the contract, the arbitration provision would still bind the plaintiff because "it [was] not a material alteration within the meaning of O.C.G.A. § 11-2-207(2)(b)." Id. Explaining this finding, the court wrote:

> The Uniform Commercial Code Comment to section 2-207 explains that a clause "materially alters" the contract if it would "result in surprise or hardship if incorporated without express awareness by the other party." **Where, as here, there are repeated opportunities for performance by either party and repeated opportunities for objection, and where no objection is made, that course of dealing is relevant to the meaning and terms of the written agreement, O.C.G.A. § 11-2-208(1), and bears on the issue of "unfair surprise."** Dixie's repeated failure, over sixteen prior transactions, to object to the arbitration provision (or even to read it) does not indicate unfair surprise and therefore is not "material."

Dixie Aluminum Prods. Co., 785 F.Supp. at 160 (bold added).

Thus, it is plain that there are significant differences between the above case and the instant matter. Here there have been no previous transactions between Turbochef and Cogent. See Kelly Supp. Aff. ¶ 9. The arbitration provision is not specifically referenced by its name on the front of the Second Purchase Order. Moreover, in apparent contrast to the boldface capital letters used for the arbitration clause in Dixie Aluminum, here the print used for the Additional Terms is so small that it is almost microscopic. Cf. Stanley-Bostitch, Inc. v. Regenerative Envtl. Equip. Co., Inc., 697 A.2d 323, 326 (R.I. 1997)("agreements to arbitrate must be clearly written and expressed")(internal quotation marks omitted). Further detracting from the legibility of the Additional Terms is the

fact that they were faxed to Cogent. Faxed documents are generally not as clear as the original or even a photocopy of the original.

Lastly, Dixie Aluminum Prods. Co. has been described as being widely criticized and not representing the weight of authority in determining whether an additional term constitutes a material alteration. See Trans-Tec Asia v. M/V Harmony Container, 435 F.Supp.2d 1015, 1027 (C.D. Cal. 2005). Thus, to the extent that Dixie Aluminum Prods. Co. is not factually distinguishable from the instant matter, the Court declines to follow it.

**Summary**

Rhode Island law applies to the determination of the Motion.[14] The First Purchase Order was an offer which invited acceptance in any manner. Turbochef's argument that the offer was not effective until January 26, 2006, is rejected. Cogent accepted the First Purchase Order in Rhode Island, and a contract was made between the parties prior to January 26, 2006. This finding is based on the conduct of the parties which recognized the existence of a contract prior to January 26, 2006. The Additional Terms which Turbochef sent to Cogent on January 26,

[14] It is worth noting that the provisions of the Rhode Island Uniform Commercial Code which the Court has utilized in deciding the Motion are virtually identical to the corresponding Georgia statute. Thus, the Court's conclusion would be the same even if it applied Georgia law. See, e.g., J. Lee Gregory, Inc. v. Scandinavian House, L.P., 433 S.E.2d 687, 690 (Ga. Ct. App. 1993)(explaining that "the UCC expands our conception of contract. It makes contracts easier to form .... **Parties may form a contract through conduct** rather than merely through the exchange of communications constituting offer and acceptance")(internal quotation marks omitted)(bold added); id. (noting "the UCC's broad concept of contract"); Am. Aluminum Prods. Co. v. Binswanger Glass Co., 391 S.E.2d 688, 692 (Ga. Ct. App. 1990)("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale ....").

2006, constituted a proposal for additions to the existing contract. Cogent never accepted these additions, and they did not become part of the contract. As a result, Turbochef is unable to present sufficient evidence to demonstrate an enforceable arbitration agreement. Accordingly, the Motion should be denied, and I so recommend.

**Conclusion**

For the reasons stated above, I recommend that the Motion be denied. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days[15] of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
April 26, 2007

[15] The ten days do not include intermediate Saturdays, Sundays, and legal holidays. See Fed. R. Civ. P. 6(a).