UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COGENT COMPUTER SYSTEMS, INC. | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 06-280 S |
| TURBOCHEF TECHNOLOGIES, INC. | : | |
| Defendant. | : | |

**DEFENDANT TURBOCHEF TECHNOLOGIES, INC.'S OBJECTION**
**TO UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Defendant TurboChef Technologies, Inc. ("TurboChef") hereby objects to United States Magistrate Judge David L. Martin's April 26, 2007 Report and Recommendation, recommending the denial of TurboChef's Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration. Specifically, TurboChef objects to Magistrate Judge Martin's Report and Recommendation to the extent it concludes that TurboChef is unable to show, as a matter of law, that there was an agreement to arbitrate, and that that issue should be decided under Rhode Island law, not Georgia law. (Report and Recommendation at pages 11-27). The grounds for this objection are set forth in the accompanying memorandum of law.[1]

Dated: May 9, 2007

Respectfully submitted,

/s/ *David A. Wollin*
David A. Wollin, #4950
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

[1] On April 27, 2007, TurboChef ordered the transcript of the hearing before Magistrate Judge Martin held in October 4, 2006. The transcript has not yet been prepared.

Tel: 401-274-7200
Fax: 401-351-4607

*Attorneys for Defendant TurboChef Technologies, Inc.*

**ORAL ARGUMENT REQUESTED: ONE HOUR**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2007, I did send a true copy of the within document by electronic means (ECF) to:

Peter P.D. Leach, Esq.
One Charles Street
Providence, RI 02904

Christine M. Curley, Esq.
275 Beacon Drive
North Kingstown, RI 02852

/s/ *David A. Wollin*

*416536_1.doc*

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COGENT COMPUTER SYSTEMS, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-280 S |
| | : | |
| TURBOCHEF TECHNOLOGIES, INC. | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT TURBOCHEF TECHNOLOGIES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Defendant TurboChef Technologies, Inc. ("TurboChef") submits this memorandum of law in support of its objection to United States Magistrate Judge David L. Martin's April 26, 2007 Report and Recommendation, recommending the denial of TurboChef's Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration. Specifically, TurboChef objects to Magistrate Judge Martin's Report and Recommendation to the extent it concludes that TurboChef is unable to show, as a matter of law, that there was an agreement to arbitrate, and that that issue should be decided under Rhode Island law, not Georgia law. Report and Recommendation ("R&R") at 11-27.

## INTRODUCTION

TurboChef moved to dismiss this lawsuit in its entirety or, alternatively, to stay the action and to compel enforcement of an explicit contractual arbitration agreement pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. TurboChef's position is that the parties' only valid

and enforceable contract is the Second Purchase Order[2] that TurboChef sent to Plaintiff Cogent Computer Systems, Inc. ("Cogent") on January 26, 2006. That Second Purchase Order, unlike the initial, incomplete and unenforceable Purchase Order that was sent on January 19, 2006, had the requisite *two* authorized TurboChef signatures. Moreover, that Second Purchase Order, also unlike the first one, was the only enforceable agreement because it arrived when Cogent received the requisite $89,500 deposit to fund Cogent's start-up work – a condition precedent to contract formation that *Cogent itself* insisted upon. Since that Second Purchase Order contained an explicit provision requiring arbitration of disputes (as well as the application of Georgia law), Cogent was required to arbitrate this matter.

Cogent responded that it had never received the Second Purchase Order – despite a fax confirmation of its receipt -- and that the only valid Purchase Order was the first one sent by TurboChef, containing only one signature and prior to the requisite deposit being sent. Since that First Purchase Order had no arbitration provision, Cogent argued that arbitration was not required. Alternatively, Cogent argued that even if it had received the Second Purchase Order, the First Purchase Order had already created a contract, the Second Purchase Order was never accepted and therefore there can be no agreement to arbitrate as a matter of law.

Applying a summary judgment standard, Magistrate Judge Martin made two principal rulings in his Report and Recommendation. Initially, he ruled that there were disputed issues of material fact as to whether Cogent had received the Second Purchase Order, putatively requiring a trial on that issue. R&R at 11. However, Judge Martin went on to conclude that no trial was required because, even assuming Cogent had received the Second Purchase Order, the First Purchase Order had already created a contract, and TurboChef was unable to show, under Rhode

[2] In its prior papers, TurboChef referred to the Second Purchase Order as the "complete" Purchase Order and the "corrected" Purchase Order. However, since Magistrate Judge Martin referred to it as the "Second" Purchase Order, TurboChef will do likewise in this memorandum.

Island law, that the Second Purchase Order was enforceable *as a matter of law*. R&R at 12-27. In short, Judge Martin ruled that TurboChef had failed to present sufficient evidence to demonstrate an enforceable arbitration agreement as a matter of law. In that respect, Judge Martin not only denied TurboChef's "summary judgment" motion, he in effect granted a cross-motion for "summary judgment" in Cogent's favor.

TurboChef now objects to the second of Magistrate Judge Martin's rulings – specifically, that TurboChef could not present sufficient evidence to demonstrate an enforceable arbitration agreement as a matter of law and that Rhode Island law applies to that question. TurboChef respectfully submits that the Magistrate Judge's ruling should be rejected because it ignores key facts in TurboChef's favor, supplies facts and assumptions that find no support in the record and construes the facts in a light most favorable to Cogent, not TurboChef. Had Magistrate Judge Martin properly applied the "summary judgment" standard, he would have concluded that the First Purchase Order did not create a contract, that TurboChef could show that the Second Purchase Order was the only valid and enforceable contract under applicable legal principles, and that, in light of Cogent's denial of receipt of that Second Purchase Order, a trial was required on the issue of whether there is an agreement to arbitrate under the Federal Arbitration Act, 9 U.S.C. § 4 (providing that if the making of an arbitration agreement is disputed, "the court shall proceed summarily to the trial thereof").

Indeed, even assuming *arguendo* that the First Purchase Order was an enforceable contract, the Magistrate Judge erred in concluding that the Second Purchase Order, with the Additional Terms and Conditions, was a per se material alteration of the contract under UCC §2-207(2). The Magistrate Judge failed to apply the "modern approach" to that issue and, as before, made factual conclusions without any evidentiary support that Cogent had the burden to supply.

## FACTUAL BACKGROUND

In deciding whether TurboChef's motion to arbitrate should be denied outright as a matter of law, Magistrate Judge Martin indicated that he considered the facts "which are either as alleged by TurboChef or undisputed." R&R at 12. This was a correct statement of the applicable law. However, Magistrate Judge Martin ignored key facts in TurboChef's favor, supplied facts and assumptions that had no support in the record, and construed the facts in a light most favorable to Cogent, not TurboChef. Set forth below are all the facts in the record (including the omitted ones) that TurboChef submitted to the Court or were undisputed.[3]

Defendant TurboChef is a pioneer in the rapidly emerging world of speed cooking. Declaration of April McLain ("McLain Decl.") at ¶ 1. Utilizing patented technologies, TurboChef designs, manufactures and markets a variety of speed cooking solutions for commercial and residential use. *Id.* TurboChef's corporate headquarters are located in Atlanta, Georgia, while its global operations are in Carrollton, Texas. *Id.* at ¶¶ 3, 13.

On January 17, 2006, Terry Gray, TurboChef's Director of Imbedded and Hardware Controls, telephoned Michael Kelly, Cogent's Vice President of Engineering, to discuss the possibility of Cogent designing and supplying custom single board micro computers ("boards") to control a customized display TurboChef planned to use for its new residential ovens. Declaration of Terry Gray ("Gray Decl.") at ¶ 5. Gray asked Kelly to send him a proposal outlining what Cogent could provide to TurboChef. *Id.* at ¶ 6.

At Gray's January 17, 2006 telephone call, Gray explained TurboChef's specifications to Kelly. *Id.* Gray told him that TurboChef was seeking a microprocessor (ARM 9) controller utilizing an Epson video control which could be used to control the LCD display for a residential

[3] The facts are based on the Declarations of April McLain and Terry Gray and supporting exhibits, and the exhibits from the Affidavit of Michael Kelly submitted with the parties' original papers.

oven. *Id*. Kelly responded that Cogent had a controller using an Epson video control which could be married to an existing controller interface. *Id*. Gray asked Kelly to send a proposal outlining what Cogent could provide. *Id*. This was a very preliminary conversation; they did not agree on any terms such as pricing, quantity and delivery dates. *Id*. Moreover, the controller TurboChef was seeking had to be designed and produced by Cogent after TurboChef provided schematics for the residential ovens TurboChef was building. *Id*.

On January 18, 2006, Gray received an email from Kelly which is attached as Exhibit 1 to Kelly's Affidavit. *Id*. at ¶ 7. The email contained two separate proposals for TurboChef's consideration. *Id*. The first called for a two-part design consisting of two boards – the first board would be a small board with a microprocessor (ARM 9) and the second board (or custom target board) would have all the components needed to control the oven. *Id*. The first, smaller board would plug directly into the second custom target board. The two-part design is reflected in items 1 through 3 in Kelly's email. *Id*. He was proposing a price for the two-part board design of $149 each plus the unspecified actual cost for the custom target board and parts (referenced as "PCB" in the email). *Id*. This two-part design would be delivered in lots of 500. **However, under this first proposal, TurboChef would have to prepay the cost of the first 500 before Cogent would agree to begin the work.** *Id*. **Cogent insisted on the prepayment at the start in order to fund the work needed for the target of the first 500 custom built boards.** *Id*. The prepayment was a condition of Cogent's agreement with TurboChef. Id. at ¶ 17. **This prepayment was in lieu of a non-recurring engineering fee (NRE) for design and engineering work.** *Id*. at ¶ 7. Thereafter, each additional lot of 500 would have to be prepaid. *Id*.

Kelly's email contained a second proposal distinct from the first. The second proposal called for a "flattened" design. *Id*. at ¶ 8. This means that the two boards would be combined into a single board or "flattened" out. *Id*. Kelly indicated that the design could be "flattened" for an additional fee of $25,000 plus unspecified additional costs for the PCB, parts, etc. for up to 25 units. *Id*. After the design was created, the proposed price for each flattened board was $149. However, the minimum order would be 1,000 units. *Id*.

Kelly's email also contained additional options for TurboChef's consideration. *Id*. at ¶ 9. Cogent was offering to charge a license fee of $125,000 after the first 5,000 units had been produced. *Id*. This was an "intellectual property" fee that would allow TurboChef to purchase the design if we wanted to have another manufacturer produce the boards. *Id*. Cogent also proposed a $25,000 fee to provide up to six months of production support for TurboChef, including emails and limited telephone support but no travel. *Id*. In a subsequent email, Kelly proposed a maximum fee of $30 for the custom target board and parts. *Id*. at ¶ 10.

Later that day, Gray spoke to Kelly and told him that we would consider Cogent's competing proposals internally at TurboChef and get back to him. *Id*. at ¶ 11. Gray told Kelly that any proposal would have to be subject to internal review and that a purchase order would have to be issued setting forth what TurboChef was offering to purchase. *Id*. Gray had no authority to approve any of the proposals in his email, particularly given the large amount of money at issue, and at no time did he ever accept any of Cogent's proposals on any telephone call he had with Kelly. *Id*. In particular, Gray needed to discuss the proposals with Max J. Abbott, Senior Vice President for TurboChef's Residential Division, and seek his consent and approval, along with that of Miguel Fernandez, Vice President of Finance & Controller. *Id*.

Given the time constraints in which TurboChef was operating to produce a working oven for the residential market, Gray recommended that TurboChef proceed with the first proposal for a two-board design but insisted that the first 500 boards be produced by April 1, 2006, with the remaining 4,500 boards delivered over a period of one year. *Id*. at ¶ 12. **TurboChef understood that Cogent would not begin work until TurboChef had prepaid $89,500 for the first 500 boards.** *Id*. TurboChef also decided internally against paying Cogent a $125,000 license fee or a $25,000 support fee. *Id*. Gray received the approval of Max Abbottt and Miguel Fernandez and then asked April McLain, Purchasing Agent for TurboChef, to send a purchase order to Cogent reflecting what TurboChef was offering to purchase. *Id*.

On or about January 19, 2006, April McLain spoke to Kelly and told him that she would be sending him a Purchase Order for 5,000 boards, but that she only had one signature, that of Max J. Abbott, and that **she would need the approval of TurboChef's corporate headquarters in Atlanta, Georgia with a second authorized signature for this purchase order.** McLain Decl. at ¶¶ 6, 11. Kelly asked McLain to send the Purchase Order right away without waiting for approval from corporate headquarters via the second signature. *Id*. at ¶ 6.

On January 19, 2006, Ms. McLain faxed to Cogent Purchase Order No. PO600090, dated January 18, 2006, for 5,000 boards. *Id*. at ¶ 7. The Magistrate Judge referred to the January 19, 2006 Purchase Order as the "First Purchase Order." A copy of the January 19, 2006 fax cover sheet and the First Purchase Order that was faxed on that date is attached as Exhibit 1 of McLain's declaration. In her fax cover sheet, she specifically indicated: "Once I have the second signature, I will re-fax the PO to you." *Id*.

**A key provision of the Purchase Order was that TurboChef would prepay $89,500 to fund the work for the first 500 boards which were to be delivered no later than April 1,**

**2006.** *Id*. at ¶ 8. Specifically, the Purchase Order stated: "TurboChef will pre-pay for the first 500 of each board totaling $89,500. First 500 of each board are due by April 1, 2006. The remaining 4500 of each board to be delivered over a period of one year." *Id.*

**Six days later, on January 25, 2006, Gray received a telephone call from Kelly that he had not received the First Purchase Order or the $89,500 prepayment for the first 500 boards.** Gray Decl. at ¶ 13. Gray told Kelly that he would resend it, along with the prepayment. *Id*.

At or about the same time, McLain learned that the First Purchase Order that was previously sent to Kelly, which Kelly claimed he had not received, was incomplete and had inadvertently omitted language indicating that the Purchase Order was subject to Additional Terms and Conditions and would not constitute an offer to buy in the absence of such terms and conditions. McLain Decl. at ¶ 9.

That same day, January 25, TurboChef's Miguel Fernandez forwarded to McLain and Gray Purchase Order No. PO600090 with the Additional Terms and Conditions for transmittal to Cogent. Gray Decl. at ¶ 14. The Magistrate Judge referred to the Purchase Order with the Additional Terms and Conditions as the "Second Purchase Order." In addition, in order to expedite the payment of the $89,500 to Cogent to fund the work, Gray sent email messages to his colleagues asking "when exactly will the pre-payment check for the first 500 boards from Cogent be cut? Remembering that the pre-payment is in lieu of an NRE fee, and that our schedule is extremely tight . . . that it is important for us to expedite getting them the money." Affidavit of Michael Kelly at Exh. 3; Gray Decl. at ¶ 17. The emails are attached to Kelly's affidavit at Exhibit 3.

Also on January 25, 2006, in order to confirm for Kelly that the requisite deposit would arrive on January 26, 2006 to fund the work, Gray forwarded to Kelly a string of internal emails at TurboChef about the pre-payment. Gray Decl. at ¶ 17; Kelly Aff. at Exh. 3. The emails stated as to the requisite deposit that Cogent was insisting upon: "OK. We will issue payment today." *Id.* In one of those emails, dated January 25, 2006 from Miguel Fernandez to Gray, Fernandez makes clear that TurboChef would be sending a purchase order which Kelly previously indicated he had not received, stating: "Ok. We will issue po today." *Id.*. Thus, Kelly would have known from the emails he was forwarded that he would be receiving a purchase order on or about January 25, 2006. Gray Decl. at ¶ 17.

Later that day, the prepayment of $89,500 was sent by Federal Express so as to arrive at Cogent on January 26, 2006. McLain Decl. at ¶ 15. That same day, McLain tried to send the Second Purchase Order with the Additional Terms and Conditions. Gray Decl. at ¶ 15. Thereafter, McLain called Gray to say when she tried to fax the Second Purchase Order to Kelly, the fax would not go through. *Id.* Gray then called Kelly and told him about the problem. *Id.* Kelly told Gray that he would reset Cogent's fax machine and asked that the purchase order be refaxed again. *Id.* Gray told McLain of his conversation with Kelly and asked that she refax the Second Purchase Order to Cogent. *Id.*

The next day, on January 26, 2006, McLain faxed to Kelly at Cogent the Second Purchase Order containing the Additional Terms and Conditions. McLain Decl. at ¶ 10. Exhibit 2 to McLain's declaration has the Second Purchase Order faxed to Cogent. Exhibit 2 consists of four pages. The first is the fax confirmation that she sent a three-page fax to Mr. Kelly at Cogent on January 26, 2006 and that the fax was transmitted to Cogent.[4] The next page is the fax cover

---

[4] Despite this evidence, Cogent claims it never received the Second Purchase Order.

sheet and the next two pages after that are the Purchase Order and the Additional Terms and Conditions. **The complete Purchase Order also contained the requisite approval from TurboChef's Atlanta, Georgia corporate headquarters which appears to the right of Mr. Abbott's signature.** *Id.* at ¶ 11.

This Purchase Order provides that it is subject to additional terms and conditions and will not constitute an offer to buy in the absence of such terms and conditions. *Id.* at ¶ 12. Specifically, the Purchase Order states as follows:

> This Purchase Order is not effective until signed by an authorized representative of TurboChef Technologies, Inc. This Purchase Order is subject to additional terms and conditions (often presented on the reverse side) and will not constitute an offer to buy in the absence of such terms and conditions.

*Id.*

The Additional Terms and Conditions has an arbitration clause requiring any controversy arising out of or relating to the Purchase Order to be resolved by arbitration in Atlanta, Georgia, the location of TurboChef's corporate headquarters, pursuant to the Rules of the American Arbitration Association. *Id.* at ¶ 13. Specifically, Paragraph 16 of the Additional Terms and Conditions provides as follows:

> Any controversy arising out of or relating to this Order including any modification or amendment thereof, shall at the Buyer's option be resolved by arbitration in Atlanta, Georgia, pursuant to the Rules then obtaining of the American Arbitration Association. The parties agree that the arbitrators sitting in any such controversy shall have no power to alter or modify any express provision of this Order, or to make any award which by its terms effects such alteration or modification. The parties consent to the application of the Georgia or Federal Arbitration statutes and to the jurisdiction of the Courts of the United States District Court of the Northern District of Georgia, for all purposes in connection with said arbitration and further consent that any notice, process or notice of motion or other application to either of said Courts or Judges thereof, or of any notice in connection with any arbitration or arbitration award hereunder, may be served in or out of the State or Northern District of Georgia by certified or registered mail, return receipt requested or by personal service, provided a reasonable time for appearance is allowed, or in such other manner as may be

> permitted under the Rules of the American Arbitration Association or of said Courts. Judgment upon the award rendered may be entered by any Court having jurisdiction. Any provision remedy (including, without limitation, injunctive or other equitable relief) which, but for this provision to arbitrate disputes would be available at law shall be available to the parties hereto pending arbitration.

*Id*. The Additional Terms and Conditions also contains a Governing Law clause in Paragraph 21: "This Order and the construction of the provisions hereof shall be construed and interpreted in accordance with the laws of the State of Georgia, including Georgia Uniform Commercial Code as in effect on the date hereof, *provided, however*, that Buyer shall be entitled to the benefits of any revisions in the Georgia Uniform Commercial Code thereafter which increase the rights of buyers of goods." *Id*. at ¶ 14.

On January 26, 2006, the same day that Cogent received the Second Purchase Order, TurboChef's check for $89,500, reflecting the required pre-payment to begin the work for the first 500 boards, arrived by Federal Express at Cogent's office in Smithfield, Rhode Island. *Id*. at ¶ 15. A copy of an email from Federal Express confirming delivery of the TurboChef check is attached as Exhibit 3 to McLain's declaration.

After being sent the Second Purchase Order and the $89,500 check, Cogent never objected at any time to any of the terms of that Purchase Order, including the Additional Terms and Conditions. *Id*. at ¶ 16. Rather, Cogent worked to fulfill the requirements of the Purchase Order. *Id*.; Gray Decl. at ¶ 18. However, Cogent failed to produce the 500 boards by April 1, 2006 and has never done so. Gray Decl. at ¶ 19.

On or about June 14, 2006, Cogent brought this lawsuit against TurboChef, claiming that TurboChef failed or refused to give final approval for the design of the boards ordered pursuant to Purchase Order No. PO600090, failed or refused to provide Cogent with a firm delivery date for the first 500 units and unilaterally terminated the Order. The complaint asserts counts for

breach of Purchase Order No. PO600090 (Count I), breach of the implied covenant of good faith and fair dealing (Count II) and unjust enrichment (Count III). TurboChef filed its Motion to Dismiss or, Alternatively, to Stay and Compel Arbitration.

**U.S. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

United States Magistrate Judge Martin, applying a summary judgment standard, made two principal rulings in his Report and Recommendation. Initially, he ruled that there were disputed issues of material fact as to whether Cogent had received the Second Purchase Order, putatively requiring a trial on that issue. R&R at 11. However, Judge Martin went on to conclude that no trial was required because TurboChef was unable to satisfy its initial burden of demonstrating that there is an enforceable arbitration agreement (*i.e.*, the Second Purchase Order). R&R at 12-27. Specifically, he concluded that, even assuming Cogent had received the Second Purchase Order, the First Purchase Order had already created a contract, and TurboChef was unable to show, under Rhode Island law, that the Second Purchase Order was enforceable *as a matter of law*. *Id.* With respect to this latter ruling, Magistrate Judge Martin reasoned that the First Purchase Order was an offer, that Cogent accepted this offer prior to January 26 through commencement of the work, thus creating an enforceable contract between the parties under Rhode Island law, and that the Second Purchase Order sent on January 26, 2006, with the Additional Terms and Conditions, was never accepted by Cogent and would have *per se* materially altered the contract. *Id.*

# ARGUMENT

## I. TURBOCHEF PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH THAT THE ONLY ENFORCEABLE CONTRACT WAS THE SECOND PURCHASE ORDER

TurboChef respectfully submits that the Magistrate Judge's ruling should be rejected because it ignores key facts in TurboChef's favor, supplies facts and assumptions that find no support in the record, and construes the facts in a light most favorable to Cogent, not TurboChef. *See Mandel v. Phoenix, Inc.*, 456 F.3d 198, 204-05 (1st Cir. 2006) (on summary judgment, court must consider the evidence and all reasonable inferences therefrom "in the light most hospitable to the summary judgment loser"). Had the Magistrate Judge Martin properly applied the "summary judgment" standard based on the evidence submitted by TurboChef, he would have concluded that the First Purchase Order did not create a contract, that TurboChef could show that the Second Purchase Order was the only valid and enforceable contract under applicable legal principles, and that, in light of Cogent's denial of receipt of that Second Purchase Order, a trial was required on the issue of whether there is an agreement to arbitrate. *See Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980) ("Only when there is no genuine issue of fact concerning the formation of the agreement [to arbitrate] should the court decide as a matter of law that the parties did or did not enter into such an agreement."); *Bergquist Co. v. Sunroc Corp.*, 777 F. Supp. 1236, 1244 (E.D. Pa. 1991) (same).

### A. The Magistrate Judge's Ruling That The First Purchase Order Was A Valid and Enforceable Contract Is Contradicted By TurboChef's Evidence

Magistrate Judge Martin proceeded initially with the premise that TurboChef was contending that the First Purchase Order was a valid and enforceable order that Cogent accepted, thereby creating an enforceable contract between the parties. R&R at 16-17. This assumption informed the rest of his analysis including his conclusion that Rhode Island law, not Georgia

law, applied in this lawsuit. *Id*. at 17-18. Magistrate Judge Martin's ruling in this regard is legally erroneous for three fundamental and independent reasons.

First, this conclusion is belied by the evidence that TurboChef submitted in this case that the First Purchase Order was not an offer that could be accepted to create an enforceable contract because the only valid and enforceable offer was one that contained the requisite *two* authorizations including, critically, from the corporate headquarters in Atlanta, Georgia.[5] April McLain of TurboChef made clear in her declaration – and so informed Cogent's Kelly – that the First Purchase Order she was sending to Kelly for 5,000 boards had only one signature and that **she would need the approval of TurboChef's corporate headquarters in Atlanta, Georgia with a second authorized signature for this purchase order.** McLain Decl. at ¶¶ 6, 11. The fact that Kelly asked McLain to send the Purchase Order right away without waiting for approval from corporate headquarters via the second signature does not change that result – two authorized signature were necessary for a valid and enforceable purchase order. It is axiomatic

[5] The Magistrate Judge incorrectly read TurboChef's reply brief to the effect that TurboChef was claiming that the First Purchase Order was a valid and enforceable offer. R&R at 16. The passage that the Magistrate Judge principally relied upon (TurboChef's Reply at 8) was in response to Cogent's argument that the First Purchase Order was an "acceptance" of an oral offer that Cogent (via Kelly) had made in the Kelly-Gray telephone conversation of January 17, 2006. TurboChef's response was that the First Purchase Order was not an acceptance, but more properly was viewed as an offer. However, TurboChef has never asserted that the first Purchase was a valid and enforceable offer. To the contrary, TurboChef has consistently argued, as it did in its reply, that the First Purchase Order, even if received by Cogent, was "not in force" because there was only one authorized signature and Cogent had not received, at its own request, the pre-payment of $89,500. TurboChef Reply at 4, 18. As noted on page 18, for instance, "the only operative contract is the corrected Purchase Order and the Additional Terms and Conditions" because, *inter alia*, the First Purchase Order lacked the requisite two authorized signatures and the $89,500 had not been paid until January 26, 2006. Only when those two conditions were met was the Second Purchase Order enforceable on that date. *Id*. at 4, 18. *See also* Reply at 8 (the First Purchase Order did not create "a valid, enforceable contract because a condition precedent had yet to be fulfilled – that is, the receipt of the upfront fee"; until that occurred on January 26, 2006, "there was no enforceable contract"). The same is true for the passage in TurboChef's Reply at page 12, which the Magistrate Judge referenced as well. Just prior to that passage, TurboChef made clear what it considered as the only enforceable contract – the Second Purchase Order. TurboChef Reply at 11 (the enforceable contract between Cogent and TurboChef "consisted of the corrected Purchase Order and the Additional Terms and Conditions").

that the offeror is the master of his offer and is free to set the terms thereof. Restatement (Second) of Contracts § 29, comment a.[6]

Magistrate Judge Martin attempted to address McLain's statement as follows: "McLain's advisement to Kelly (that she would be sending him a purchase order for 5,000 boards but that she needed a second signature, see McLain Decl. ¶¶ 6-7) cannot be viewed as communicating anything more than that this was an administrative detail which McLain required to comply with TurboChef's internal procedures." R&R at 21. However, this conclusion is directly contrary to McLain's declaration that the second signature was a necessary requirement for a validly authorized Purchase Order to exist. McLain Decl. at ¶¶ 6, 11. There is absolutely nothing in the record to support the Magistrate Judge's assertion that the second signature was merely an inconsequential "administrative detail" which was needed merely to comply with "internal procedures." The Magistrate Judge did not cite to any part of the record in support of that assertion.

Alternatively, Magistrate Judge Martin concluded that, even if McLain's statement could be viewed as communicating to Cogent that the First Purchase Order was not valid because it lacked a second signature, "the emails which Gray forwarded to Kelly on January 25, 2006, explicitly notified Cogent that all of TurboChef's internal requirements had been satisfied and that payment and a purchase order with the second signature would be sent." R&R at 21-22. However, this conclusion was in error too. The emails, attached as Exhibit 3 to Kelly's affidavit, make no mention that a purchase order with a second authorized signature had been obtained or would be sent to Cogent. All it said was: "Ok. We will issue po today." Since Kelly claimed that he had not even received the First Purchase Order with the single signature, it was equally

[6] *Accord*, *Lang v. Gates*, 36 F.3d 73, 75 (9th Cir. 1994); *Atkinson v. Cook*, 271 Ga. 57, 58, 518 S.E.2d 413, 414 (1999).

likely that Cogent believed, upon reading these emails, that the First Purchase Order would be resent. Thus, Magistrate Judge Martin was wrong to conclude that the emails, in any respect, demonstrated that TurboChef's so-called "internal requirements" had been satisfied and that the First Purchase Order, lacking the two requisite authorized signatures and claimed by Kelly not to have been received, was an enforceable offer that could be accepted by performance.

If the Magistrate Judge's ruling is upheld, it will mean that an offerer is not the master of his or her own offer. Here, TurboChef insisted on two authorized signatures. But for Cogent's request to send the First Purchase Order "right away" without waiting the second signature, Cogent would not have received the Purchase Order until that document had been fully authorized and the Additional Terms and Conditions had been added. Cogent should not be allowed to insist upon a less-than-completely authorized Purchase Order, quickly begin work and then claim a contract is automatically in force, precluding the offerer from preparing a complete and fully authorized Purchase Order.

<u>Second</u>, Magistrate Judge Martin's conclusion that the First Purchase Order was a valid and enforceable order that Cogent accepted is contrary to TurboChef's evidence demonstrating that Kelly did not receive the First Purchase Order. Although McLain stated in her declaration that on January 19, 2006, she faxed the First Purchase Order to Cogent, **Gray received a telephone call from Kelly on January 25, 2006, that he had not received the First Purchase Order or the $89,500 prepayment for the first 500 boards.** Gray Decl. at ¶ 13. Gray told Kelly that he would resend it, along with the prepayment. *Id*. In fact, the purchase order that was then sent was the Second Purchase Order that contained the Additional Terms and Conditions. Based on TurboChef's evidence, Cogent received that Second Purchase Order on

January 26, 2006. Thus, Cogent could not have accepted, through performance or otherwise, the First Purchase Order that Kelly informed Gray he had not received.

Third, the Magistrate Judge erred in concluding that the First Purchase Order was accepted by Cogent prior to January 26, 2006 when the Second Purchase Order arrived. He concluded the First Purchase Order was "accepted" for two reasons. First, "Gray would have had no reason on January 25, 2006 to confirm for Kelly that payment would arrive the next day unless Cogent had communicated in one form or another that the offer contained in the First Purchase Order was acceptable to Cogent." R&R at 17. Second, Cogent accepted the offer by commencing work on the contract. *Id*.

However, as Magistrate Judge Martin recognized, the beginning of performance by an offeree "can be effective so as to bind the offeror *only if followed within a reasonable time by notice to the offeror*." UCC 2-206, comment 3 (emphasis added). "For the protection of both parties it is essential that notice follow in due course to constitute acceptance." *Id*. Here, there is no evidence in the record that Cogent ever *communicated to TurboChef* prior to January 26, 2006 that it was beginning substantive work on the project. To the contrary, Gray stated in his declaration that **TurboChef understood that Cogent would not begin work until TurboChef had prepaid for the first 500 boards at $89,500 to fund the work.** Gray Decl. at ¶ 12. That did not occur until January 26, 2006.

Magistrate Judge Martin merely presumed that Cogent must have "communicated *in one form or another* that the offer contained in the First Purchase Order was acceptable to Cogent." R&R at 17, 20. There is no evidence of such communication in the record. In fact, Judge Martin could not establish what "form" that communication had taken.

Judge Martin erroneously based that presumption that a communication had occurred on Gray's emails to Kelly on January 25, 2006 that the pre-payment would arrive the next day. *Id*. at 17, 19-20. Judge Martin states that TurboChef would have had no reason on January 25, 2006 to seek to expedite payment to Cogent and forward the emails to Kelly "unless Gray knew that Cogent had accepted TurboChef's offer." *Id*. at 20. However, Judge Martin ignored that Kelly had indicated to Gray that he had *not* received the First Purchase Order or the pre-payment, and thus the email trail was designed to inform Kelly that a purchase order and the deposit would be forthcoming. Rather than show TurboChef's confirmation that a contract was already in place, those email actually show the opposite – no purchase order and no deposit had been received by Cogent – and that TurboChef wanted to sent a valid offer with two requisite signatures and comply with Cogent's demand for the pre-payment.

Likewise, Magistrate Judge Martin erroneously based his presumption on the issuance and dispatch of the pre-payment on January 25, 2006. He stated: "TurboChef would have had no reason to send the check to Cogent on January 25, 2006, unless it believed that TurboChef had entered into a contractual agreement with Cogent and that such act was required under the contract." *Id*. at 20.[7] To the contrary, TurboChef sent the $89,500 and the Second Purchase Order because Kelly informed Gray that he had not received the First Purchase Order, and TurboChef wanted to present a valid and properly enforceable offer and satisfy Cogent's demand for pre-payment.

Similarly, the Magistrate Judge erred in relying on the January 19, 2006 execution of a Non-Disclosure Agreement as establishing that Cogent had communicated it had started substantive work on the project. R&R at 19. The Non-Disclosure Agreement was executed

---

[7] *See also* R&R at 17 n. 11 ("Relatedly, it is beyond belief that TurboChef would send $89,500 to Cogent without knowing whether Cogent had accepted the offer contained in the First Purchase Order.").

*prior to* Kelly informing Gray that he had not received the First Purchase Order and makes no mention of actually beginning work. A Non-Disclosure Agreement, as the Magistrate Judge properly recognized, can be executed as part of preliminary discussions preceding the reaching of a contractual arrangement. *Id*. at 20. The fact that the First Purchase Order contained price, quantity and time of performance terms does not indicate, one way or another, that the Non-Disclosure Agreement reflected that Cogent had communicated work had in fact begun.

Thus, based on all the evidence presented by TurboChef, construed in a light most favorable to TurboChef, Magistrate Judge Martin erroneously concluded that the First Purchase Order was a valid offer that Cogent accepted through performance prior to January 26, 2006.

B. The Magistrate Judge's Ruling That The $89,500 Pre-Payment Was Not A Condition Of Contract Formation Is Contradicted By TurboChef's Evidence

Magistrate Judge Martin also rejected TurboChef's argument that the First Purchase Order was not a valid and enforceable contract that Cogent accepted because a condition precedent to contract formation had not been achieved – Cogent receiving the pre-payment of $89,500 to begin the work. Magistrate Judge Martin rejected this argument, ruling that the payment of $89,500 was "a condition of contract performance, not of contract formation." R&R at 16, n.10 & 22 (and cases cited therein). Alternatively, Judge Martin rejected this argument on the basis that the "requirement for prepayment was clearly included in the contract for Cogent's benefit" which Cogent could waive and TurboChef had no right to insist on its performance. *Id*. at 16 n.10.

Both of these rulings are legally erroneous. Magistrate Judge Martin's ruling that the payment of $89,500 was "a condition of contract performance, not of contract formation," is contrary to the record evidence, construed in a light most favorable to TurboChef. The evidence supports the conclusion that receipt of the pre-payment was a condition of contract formation.

There is no dispute that Cogent insisted upon the prepayment; it was so important it was made an explicit condition of the contract itself. Gray Decl. at ¶¶ 7, 12, 17; McLain Decl. at ¶ 8. **As Gray noted, it "was a condition of Cogent's agreement with TurboChef."** Gray Decl. at ¶ 17. **Cogent insisted on the prepayment at the start in order to fund the work needed for the target of the first 500 custom built boards.** *Id*. at ¶ 7. **This prepayment was in lieu of a non-recurring engineering fee (NRE) for design and engineering work.** *Id*. This was confirmed by Gray, who understood, based on his conversations with Kelly, that **Cogent would not begin work until TurboChef had prepaid for the first 500 boards at $89,500 to fund the work.** *Id*. at ¶ 12. Indeed, this was the reason that Gray, upon learning that Kelly had not received the First Purchase Order and the pre-payment, moved to expedite payment and get the deposit to Kelly, as reflected in the emails forwarded to Kelly. This was a condition insisted upon by Cogent for the deal itself. *Id*. Magistrate Judge Martin erroneously construed this evidence in a light most favorable to Cogent – that the deposit was simply a condition of performance, not contract formation. *See Aurora Natural Gas, LLC v. Continental Natural Gas, Inc.*, CA 3:98-CV-1348-BC, 1999 WL 304561, at *8-10 (N.D. Tex. May 10, 1999) (denying summary judgment when there is competent summary judgment evidence that contract provision was either a condition precedent to contract formation or contract performance). And contrary to the cases on which Magistrate Judge Martin relied, it is well settled that a deposit can be a condition of contract formation, not merely contract performance. *See, e.g., Matteo v. Apponaug Mini Storage*, C.A. No. 99-2751, 2006 WL 1746100, at *10 (R.I. Super. June 21, 2006) (ruling that deposit was condition of contract formation); *Athens Heart Center v. Brasstown Valley Resort, Inc.*, 275 Ga. App. 607, 608, 621 S.E.2d 565, 566 (Ga. App. 2005) (ruling that deposit was a condition of contract formation, concluding: "'Where a contract is contingent on the meeting of some

condition, it is not enforceable by either party until the condition has been met.'") (quotation omitted). Thus, it was for a jury to decide whether there was a condition precedent to contract formation or contract performance in this case. *Crest Ridge Constr. Group v. Newcourt, Inc.*, 78 F.3d 146, 150-51 (5th Cir. 1996) (ruling it was a jury question whether evidence showed condition precedent to contract formation or contract performance).

Judge Martin's alternative argument that the "requirement for prepayment was clearly included in the contract for Cogent's benefit" which Cogent could waive and TurboChef had no right to insist on its performance is also legally erroneous. R&R at 16, n.10. There is no evidence in the record that Cogent ever waived the prepayment requirement. As the case cited by Magistrate Judge Martin indicates, to constitute a waiver of a contractual right, "there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Colonial Penn Ins. Co. v. Bauso*, C.A. No. 88-5959, 1989 WL 18831, at *5 (E.D. Pa. Mar. 3, 1989). No such clear, unequivocal and decisive act of Cogent appears anywhere in the record. In fact, the opposite is the case – it was consistently required by Cogent. That TurboChef allegedly may have had no right to insist on its performance is beside the point because, here, Cogent insisted upon it as a condition of an enforceable contract and never waived the requirement as a critical element of the deal with TurboChef.

Based on the foregoing, the prepayment requirement was not met until it arrived on January 26, 2006 – the same date that the Second Purchase Order with the Additional Terms and Conditions arrived at Cogent's offices. It was that Purchase Order containing the two requisite authorized signatures, and that one alone, that constituted the only valid and enforceable offer. That Purchase Order containing an arbitration agreement was accepted when Cogent in fact

commenced work and so informed TurboChef. McLain Decl. at ¶ 16; Gray Decl. at ¶18; UCC § 2-206(1)(b), 206(2) & comment 3.

C. Georgia Law Applies In This Case

On the basis of TurboChef's evidence, Magistrate Judge Martin should have concluded that the First Purchase Order was not a valid and enforceable offer that Cogent accepted prior to January 26, 2007. Rather, TurboChef presented evidence sufficient to establish an agreement to arbitrate, to wit, the Second Purchase Order. As outlined in greater depth in the Factual Background, the First Purchase Order to Cogent did not have the requisite two signatures. McLain Decl. at ¶¶ 6, 11. And as of January 25, 2006, Kelly claimed he had not received it. Gray Decl. at ¶ 13. Moreover, no Purchase Order was in force until Cogent received, at its own request, the pre-payment of $89,500 to begin the design and construction of the first 500 boards. Gray Decl. at ¶¶ 7, 12, 17; McLain Decl. at ¶ 8. The Second Purchase Order with the Additional Terms and Conditions was, in fact, the only valid offer because it was received, along with the $89,500 check, on January 26, 2006. McLain Decl. at ¶¶10-11, 15. That Purchase Order was received by Cogent, as indicated in the fax confirmation sheet. *Id*. at ¶ 10 & Exh. 2. Thereafter, Cogent deposited the check, began work on the project and never objected to any aspect of the corrected Purchase Order. *Id*. at ¶ 16; Gray Decl. at ¶ 18. The Second Purchase Order, by its explicit terms on the first page, was not a valid, enforceable offer without the Additional Terms and Conditions. McLain Decl. at ¶ 12.

On the basis of the foregoing, Magistrate Judge Martin should also have ruled that Georgia law, not Rhode Island law, applied. Specifically, the Additional Terms and Conditions contain a Governing Law clause in Paragraph 21 establishing that Georgia law applies to the Purchase Order: "This Order and the construction of the provisions hereof shall be construed

and interpreted in accordance with the laws of the State of Georgia, including Georgia Uniform Commercial Code as in effect on the date hereof, *provided, however*, that Buyer shall be entitled to the benefits of any revisions in the Georgia Uniform Commercial Code thereafter which increase the rights of buyers of goods." McLain Decl. at ¶ 14.

On the basis of the foregoing, since the Second Purchase Order was the only enforceable offer that created a contract, Magistrate Judge Martin erroneously concluded that the Second Purchase Order "can only be viewed as a proposal to add Additional Terms to the contract," that there is no evidence Cogent ever agreed to these terms or that they *per se* materially alter the contract. R&R at 22-27. The Magistrate Judge could only have reached these conclusions based on his earlier erroneous determination that the First Purchase Order was accepted by Cogent, thereby creating a binding contract.

## II. THE MAGISTRATE JUDGE ERRED IN CONCLUDING THAT THE ARBITRATION PROVISION WAS A *PER SE* MATERIAL ALTERATION OF THE CONTRACT

Even assuming the First Purchase Order was a valid contract, Magistrate Judge Martin erroneously concluded that the Second Purchase Order, as a written confirmation of the First Purchase Order, was a proposal to add Additional Terms under UCC 2-207 that constituted a *per se* material alteration of the contract because it would result in surprise or hardship if incorporated without Cogent's express consent. R&R at 22-27 (citing § 6A-2-207, comment 4; *Supak Sons Mfg. Co. v. Percel Indust., Inc.*, 593 F.2d 135, 136 (4th Cir. 1979) (noting that "the courts of last resort of both [New York and North Carolina] have held that the addition of an arbitration clause constitutes a Per se material alteration of the contract")). Magistrate Judge Martin concluded, without any citation to the record, that Cogent "would have no reason to think that by accepting the offer contained in the First Purchase Order it would be agreeing to give up

its rights to seek relief in a Rhode Island judicial forum in the event of a dispute with TurboChef or that it would be agreeing to have the contract construed and interpreted according to Georgia and not Rhode Island law." *Id*. at 23. Similarly, without record support, he concluded that requiring Cogent to appear for arbitration in Atlanta, Georgia would be a hardship. *Id*. at 23-24.

Magistrate Judge Martin followed the so-called "New York rule" line of cases, which find that an arbitration provision to be a *per se* material alteration.[8] However, the "modern approach" favors a case-by-case materiality determination based upon a thorough examination of the surprise and hardship elements. *See, e.g.*, *Aceros Prefabricados, S.A. v. Tradearbed, Inc.*, 282 F.3d 92, 100 (2d Cir. 2002); *Trans-Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1260-62 (7th Cir. 1989); *N&D Fashions, Inc. v. DHJ Industries, Inc.*, 548 F.2d 722, 726 (8th Cir. 1976); *Bergquist*, 777 F. Supp. at 1244.[9] The modern, case-by-case approach focuses on the degree of surprise and hardship that is imposed upon the non-assenting party. *Standard Bent Glass Corp. v. Glassrobots OY,* 333 F.3d 440, 448 & n.12 (3d Cir. 2003); *Aceros Prefabricados,* 282 F.3d at 100; *Bergquist*, 777 F. Supp. at 1245. Thus, "arbitration agreements do not, as a matter of law, constitute material alterations to a contract." *Aceros Prefabricados,* 282 F.3d at 100. The burden is on the non-assenting party to show surprise and undue hardship. *Id*.; *Standard Bent Glass*, 333 F.3d at 448 & n.12; *Bergquist*, 777 F. Supp. at 1245. "This is so because the UCC presumes that between merchants additional terms will be included in a contract." *Aceros Prefabricados,* 282 F.3d at 100. Thus, if neither party introduced any evidence, the proposed additional terms would, by the plain language of UCC § 2-207(2),

---

[8] Magistrate Judge Martin also cited to comment 4 of UCC § 2-207(2), but there is nothing in that comment that supports the conclusion that an arbitration provision is a material alteration of a contract. Indeed, there is no mention of arbitration at all in the comment. *Aceros Prefabricados,* 282 F.3d at 101.

[9] For a cogent critique of the "New York" rule, see *Bergquist*, 777 F. Supp. at 1244-45 ("a per se rule is absolutely contrary to the UCC's special emphasis on the particular circumstances of each contractual relationship. . . . A per se rule cannot be justified under the UCC.").

become part of the contract. *Id*. Importantly, whether an additional term in a written confirmation constitutes a material alteration is a question of *fact* to be resolved by the circumstances of each particular case. *N&D Fashions*, 548 F.2d at 726.

Surprise includes both a subjective element of what a party actually knew and an objective element of what a party should have known. *Standard Bent Glass*, 333 F.3d at 448; *Aceros Prefabricados*, 282 F.3d at 100. An assertion of surprise and raised eyebrows are not enough. *Standard Bent Glass*, 333 F.3d at 448; *Aceros Prefabricados*, 282 F.3d at 100. As for hardship, the relevant issues are whether the arbitration provision would impose "substantial economic hardship" on the non-assenting party or would "substantially alter the distribution of risk." *Trans-Aire*, 882 F.2d at 1262; *Bergquist*, 777 F. Supp. at 1245.

Cogent did not satisfy its burden of showing objective surprise, subjective surprise or undue hardship. In fact, Cogent presented no evidence on these two issues beyond simply noting that it had not seen the Additional Terms and Conditions until notified by TurboChef it was in default of the contract. This is insufficient to meet its burden. *Aceros Prefabricados*, 282 F.3d at 100-01 (ruling insufficient an affidavit from founder and general manager that the addition of the arbitration clause which company did not accept and never saw until long after the parties had entered into the contract would result in surprise and hardship); *Trans-Aire Int'l*, 882 F.2d at 1262 (ruling that arbitration provision imposes no substantial hardship upon the non-assenting party's economic welfare since that party still has the opportunity to prosecute or defend its interests albeit in a different forum); *I.K. Berry, Inc. v. Boody*, No. 99 CIV 10968 SAS, 2000 WL 218398, at *6 (S.D.N.Y. Feb. 23, 2000) (ruling that non-assenting party failed to show that addition of arbitration clause caused hardship or surprise).

By applying a *per se* rule, Magistrate Judge Martin improperly substituted an unrebuttable presumption in Cogent's favor without any evidentiary support from Cogent itself. This was in error. *See Aceros Prefabricados*, 282 F.3d at 100-01 (burden is on non-assenting party to present evidence in support of surprise and hardship); *Standard Bent Glass*, 333 F.3d at 448 & n.12 (same); *Bergquist*, 777 F. Supp. at 1245 (same).

On the other hand, TurboChef presented evidence that Cogent in fact did know or should have known of the existence of the arbitration and choice of law provisions. Specifically, TurboChef's evidence showed that Cogent received the Second Purchase Order with the Additional Terms and Conditions, and those Additional Terms and Conditions were explicitly referenced on the front side. McLain Decl. at ¶¶ 10-14. The Second Purchase Order explicitly provided, in clear and unmistakable language, that it was subject to additional terms and conditions and would not constitute an offer to buy in the absence of such terms and conditions:

> This Purchase Order is subject to additional terms and conditions (often presented on the reverse side) and will not constitute an offer to buy in the absence of such terms and conditions.

*Id*. at ¶ 12. Moreover, contrary to the Magistrate's observation that the print was "almost microscopic" (R&R at 25), the Additional Terms and Conditions were readable in the form sent to Cogent and contained appropriate subheadings in bold including "**Arbitration**" and "**Governing Law**." *Id*. at ¶¶ 13-14 & Exh. 2.

Additionally, TurboChef submits, as its own support for a lack of hardship to Cogent, the arbitration process itself. Arbitration is often a speedier, less expensive alternative to the courts. In fact, courts have held repeatedly that there is a strong federal policy favoring arbitration for dispute resolution, and that all doubts should be resolved in favor of arbitration. *See, e.g., Moses M. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *United Steelworkers*

*of America v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 582-83 (1960); *Smarttext Corp. v. Interland, Inc.*, 296 F. Supp.2d 1257, 1268 (D. Kan. 2003).

Thus, even if this Court accepts that the First Purchase Order was an enforceable contract, Cogent's failure to meet its burden of showing surprise and hardship results in the Additional Terms and Conditions becoming a part of the contract. *Aceros Prefabricados*, 282 F.3d at 100; UCC § 2-207(2). At worst, this evidence was sufficient for a jury to conclude that that there was no surprise or hardship. *Bergquist*, 777 F. Supp. at 1245. Accordingly, Magistrate Judge Martin erroneously ruled that the Second Purchase Order, as written confirmation of the First Purchase Order, was a proposal to add Additional Terms under UCC § 2-207 that constituted a *per se* material alteration of the contract because it would result in surprise or hardship if incorporated without Cogent's express consent.

## III. TURBOCHEF INCORPORTES BY REFERENCE ITS ARGUMENTS IN ITS MOVING PAPERS IN SUPPORT OF ITS OBJECTION

To the extent Cogent seeks to raise issues that were not addressed in Magistrate Judge Martin's Report and Recommendation, given that review is *de novo*, TurboChef hereby incorporates by reference its responses to those arguments as set forth in its moving papers and its reply.

**CONCLUSION**

For the foregoing reasons, Defendant TurboChef Technologies, Inc. respectfully requests that the Court reject the Report and Recommendation for the reasons discussed above.

Dated: May 9, 2007

Respectfully submitted,

/s/ *David A. Wollin*
David A. Wollin, #4950
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: 401-274-7200
Fax: 401-351-4607

*Attorneys for Defendant TurboChef Technologies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2007, I did send a true copy of the within document by electronic means (ECF) to:

Peter P.D. Leach, Esq.
One Charles Street
Providence, RI 02904

Christine M. Curley, Esq.
275 Beacon Drive
North Kingstown, RI 02852

/s/ *David A. Wollin*

*416536_1.doc*